## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| ELIJAH CARIMBOCAS, LINDA DLHOPOLSKY, AND MORGAN GRANT, on behalf of themselves and others similarly situated, | CIVIL ACTION NO. |
| *Plaintiffs*, | |
| v. | |
| TTEC SERVICES CORPORATION, TTEC SERVICES CORPORATION EMPLOYEE BENEFITS COMMITTEE, EDWARD BALDWIN, K. TODD BAXTER, PAUL MILLER, REGINA PAOLILLO, EMILY PASTORIUS, JOHN AND JANE DOES 1-20, | |
| *Defendants*. | |

## CLASS ACTION COMPLAINT

Plaintiffs Elijah Carimbocas, Linda Dlhopolsky, and Morgan Grant ("Plaintiffs"), by and through their attorneys, on behalf of the TTEC 401(k) Profit Sharing Plan (f/k/a TeleTech 401(k) Profit Sharing Plan) (the "Plan"), themselves and all others similarly situated, state and allege as follows:

### INTRODUCTION

1.      This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against TTEC Services Corporation ("TTEC"), TTEC Services Corporation Employee Benefits Committee,  and any former committees serving a comparable function ("Employee Benefits Committee"), Edward Baldwin, K. Todd Baxter, Paul Miller, Regina Paolillo, and Emily Pastorius, who are current or

former Employee Benefits Committee members, and other current and former members (collectively, the "Committee Defendants"), for breaches of their fiduciary duties.

2.      Defined contribution retirement plans, like the Plan, confer tax benefits on participating employees to encourage the accumulation of retirement savings. As of June 2021, 401(k) plans "held an estimated 7.3 trillion in assets" in the United States.[1]

3.      In a 401(k) plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l,* 135 S. Ct. 1823, 1826 (2015). In other words, the negative consequences of a plan's high fees and poorly-performing investments fall squarely on the participants in a 401(k) plan.

4.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries, requiring, respectively, that plan fiduciaries act "solely in the interest of the participants and beneficiaries," and with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1), (B).

5.      The Plan has approximately $200 million dollars in assets that are entrusted to the care of the Plan's fiduciaries. The Plan's assets under management place it in the top 0.4% of defined contribution plans in the United States and the top 0.1% based on the number of participants.[2] Given the Plan's size, it had more than adequate bargaining power to negotiate reasonable fees and expenses for Plan administration and recordkeeping.

---

[1] *See* Investment Company Institute FAQs, *available at* https://www.ici.org/faqs/faq/401k/faqs_401k.

[2] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2018, at 7, *available at* https://www.ici.org/system/files/2021-07/21_ppr_dcplan_profile_401k.pdf (last visited July 19, 2022) (describing the methodology used to compute the percentages as analyzing

6.      During the putative Class Period Defendants flagrantly breached fiduciary duties they owed to the Plan, to Plaintiffs, and other Plan participants by mismanaging the Plan's recordkeeping fees and investment options—causing millions of dollars in damages to Plan participants. Defendants, among other breaches of their fiduciary duties detailed herein: (1) failed to prudently monitor, regularly benchmark, and prudently negotiate the Plan's recordkeeping fees (*see infra*, ¶¶ 41-62); (4) allowed a service provider, T. Rowe Price, to include proprietary investments in the Plan that historically and subsequently underperformed the replaced fund and/or were more expensive investments (*id.*, ¶¶ 63-65); (5) failed to prudently consider alternatives to mutual funds in the Plan, despite the alternatives' lower fees (*id.*, ¶¶ 66-74); (6) admitted to have only "periodically" reviewed the Plan's investment options to ensure they were suitable for Plan participants—in dereliction of their duty to continually monitor *inter alia*, each investment offering—causing Plan participants to incur excessive investment fees (*id.*, ¶¶ 75-85); (7) administered the Plan during the Class Period without crucial protocol—namely, an investment policy statement—to monitor the Plan investment menu (*id.*, ¶¶ 83-84); and (8) failed to timely include target retirement date funds in the Plan's investment menu (*id.*, ¶¶ 85-87).

7.      Plaintiffs, accordingly, assert claims against Defendants for breach of the fiduciary duties of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## JURISDICTION AND VENUE

8.      This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

---

Form 5500s, which are mandatory filings with U.S. Department of Labor and "include the number of plan participants, assets held in the plan, and other plan features.").

9.      Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2), which permits participants in an employee retirement plan to pursue a civil action on behalf of the plan to remedy breach of fiduciary duties.

10.     The Court has personal jurisdiction over TTEC and the Employee Benefits Committee because TTEC is headquartered and transacts business in this District, resides in this District, and/or has significant contacts with this District.

11.     The Court has personal jurisdiction over Edward Baldwin, K. Todd Baxter, Paul Miller, Regina Paolillo, and Emily Pastorius because ERISA confers nationwide personal jurisdiction and these individuals reside in and have sufficient ties with the United States. 29 U.S.C. § 1132(e).

12.     Venue is proper in this District pursuant to 29 U.S.C. § 1132(e)(2), because the Plan is administered in this District, some or all of the violations of ERISA occurred in this District, and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### PARTIES & PLAN'S NON- PARTY SERVICE PROVIDERS

*Plaintiffs*

13.     Plaintiff Elijah Carimbocas resides in Arizona. During his employment with TTEC, Plaintiff Carimbocas participated in and made regular contributions to the Plan.

14.     Plaintiff Linda Dlhopolsky resides in Pennsylvania. During her employment with TTEC, Plaintiff Dlhopolsky participated in and made regular contributions to the Plan.

15.     Plaintiff Morgan Grant resides in Texas. During her employment with TTEC, Plaintiff Grant participated in and made regular contributions to the Plan.

16.     Plaintiffs did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed. Plaintiffs did not have and do not have actual knowledge of Defendants' flawed decision-making process with respect to the Plan, including Defendants' selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants. Having never managed a 401(k) plan the size of the Plan, Plaintiffs lacked actual knowledge of reasonable fee levels and prudent alternatives available to such plans.

17.     Plaintiffs' claims are premised on Defendants' common misconduct in administering "the entire Plan" and, consequently, they have constitutional standing to seek relief on behalf of the entire Plan irrespective that Plaintiffs did not invest in all the Plan's investment offerings during the Class Period. *Kurtz v. Vail Corp.*, 511 F. Supp. 3d 1185, 1193 (D. Colo. 2021) (collecting cases).

**TTEC**

18.     Defendant TTEC is domiciled in the state of Colorado. The Company describes itself as a global customer experience technology and services company focused on the design, implementation, and delivery of customer service platforms in various industries. TTEC employs individuals throughout the United States.

19.     TTEC is the Plan's Sponsor and a Plan administrator. TTEC is a fiduciary of the Plan because it exercised discretionary authority and control relative to management of the Plan and/or exercised authority or control relative to disposition of Plan assets and was responsible for determining the investment options available under the Plan. 29 U.S.C. § 1002(21)(A).[3]

---

[3] ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a)(1).

20.     To the extent that TTEC delegated any of its fiduciary functions to others, such as the Employee Benefits Committee, *infra*, it maintained fiduciary responsibilities with respect to the Plan. The authority to appoint, retain, and remove other plan fiduciaries constitutes discretionary authority or control over the management or administration of the plan, and thus confers fiduciary status under 29 U.S.C. § 1002(21)(A); *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1465 (4th Cir. 1996) ("[T]he power ... to appoint, retain and remove plan fiduciaries constitutes 'discretionary authority' over the management or administration of a plan within the meaning of § 1002(21)(A)."). Further, the responsibility for appointing other fiduciaries establishes a corollary duty to monitor the appointed fiduciaries to ensure that they are complying with the terms of the Plan and ERISA's fiduciary standards. *See* 29 C.F.R. § 2509.75-8 (FR-17); *Vellali v. Yale Univ.*, 308 F. Supp. 3d 673, 691 (D. Conn. 2018) ("ERISA law imposes a duty to monitor appointees on fiduciaries with appointment power") (quotation omitted).

***The Employee Benefits Committee***

21.     TTEC created and designated the Employee Benefits Committee to, *inter alia*, administer the Plan, determine the appropriateness of the Plan's investment offerings, and monitor the investments' performance. The Employee Benefits Committee is a fiduciary of the Plan because it exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets. 29 U.S.C. § 1002(21)(A).

22.     The Committee and each of its members were fiduciaries of the Plan during the Class Period within the meaning of ERISA because each exercised discretionary authority over management or disposition of Plan assets. *Id*.

23.     Edward Baldwin is a current or former member of the Employee Benefits Committee.

24.     Paul Miller is a current or former member of the Employee Benefits Committee.

25.     Emily Pastorious is a current or former member of the Employee Benefits Committee.

26.     Regina Paolillo is a current or former member of the Employee Benefits Committee.

27.     K. Todd Baxter is a current or former member of the Employee Benefits Committee.

28.     The Committee and the current and former named and unnamed members of the Committee during the Class Period, the latter referred individually as John and Jane Does 1-20, are collectively referred herein as the "Committee Defendants." The identities of the Doe Defendants are not currently known to Plaintiffs.

*Service Providers*

29.     From January 1, 2012 to December 31, 2019, Merrill Lynch was the Plan's recordkeeper and trustee.[4]

30.     From January 1, 2020, T. Rowe Price has been the Plan's recordkeeper and trustee.[5]

THE PLAN

31.     The Plan is a single-employer "defined contribution" plan in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts (and any income, expense, and gains and losses, which may be allocated to such participant's account). 29 U.S.C. § 1002(34).

---

[4] Merrill Lynch is a company of Bank of America, N.A., which served as the Plan's trustee.

[5] T. Rowe Price Retirement Plan Services, Inc. served as the Plan's recordkeeper and T. Rowe Price Trust Company served as the trustee.

32.     Teletech Holdings, Inc. established the Plan in 1991, and it was previously named the TeleTech 401(k) Profit Sharing Plan. Teletech Services Corporation was the previous Plan Sponsor. Over the years, TTEC and its predecessors have acquired other companies, who have adopted the Plan.

33.     All employees of TTEC are generally eligible to participate in the Plan. Subject to limited exceptions, employees are automatically enrolled in the Plan, and TTEC automatically withholds compensation from the participant's paycheck each payroll period for pre-tax contributions to the Plan unless the participant affirmatively elects otherwise.

34.     Plan participants may allocate their contributions among the investment options offered by the Plan, as selected by Employee Benefits Committee. According to Plan documents, during the Class Period if a participant failed to make any investment allocations, their 401(k) contributions and matching contributions were and are invested in the "qualified default investment alternative" that was selected by TTEC.

35.     As of January 1, 2020, the Plan had approximately $200 million in assets under management.

## Legal Background

36.     ERISA imposes strict fiduciary duties of loyalty and prudence upon fiduciaries of retirement plans, requiring, under 29 U.S.C. § 1104(a), in relevant part that:

> [A] fiduciary … discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A) for the exclusive purpose of:
>         (i) providing benefits to participants and their beneficiaries; and
>         (ii) defraying reasonable expenses of administering the plan;
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]

37.     These ERISA fiduciary duties are "the highest known to the law." *See, e.g.*, *Troudt v. Oracle Corp.*, 2017 WL 663060, at *5 (D. Colo. Feb. 16, 2017) (quotation omitted). "A fiduciary's process must bear the marks of loyalty, skill, and diligence expected of an expert in the field." *Sweda v. Univ. of Pa.*, 923 F.3d 320, 339 (3d Cir. 2019) (quotation omitted), *cert. denied*, 140 S. Ct. 2565 (2020). "It is not enough to avoid misconduct, kickback schemes, and bad-faith dealings." "The law expects more than good intentions." *Id.* "A pure heart and an empty head are not enough." *Id.*

### DUTY OF PRUDENCE

38.     ERISA's "prudent person" standard evaluates, *inter alia*, "fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). Plan fiduciaries, the Supreme Court recently reinforced, have a continuing duty to monitor and remove imprudent plan investments, which mandates a continuous and systematic review of the investments to ensure they are suitable. *Divane v. Northwestern Univ.*, 142 S. Ct. 737, 740-41 (2022); *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015) (holding the fiduciary duty of prudence includes "a continuing duty to monitor trust investments and remove imprudent ones").

39.     In *Divane*, the Supreme Court explained "even in a defined-contribution plan where participants choose their investments, plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options." *Id.* Separate from the duty to select prudent investments, this duty requires plan fiduciaries to remove "*any*" imprudent investment offerings, irrespective of whether lower cost options are available in the investment menu. *Id.* (emphasis added). "Fiduciaries must" also "consider a plan's power ... to obtain favorable investment products, particularly when those

products are substantially identical—other than their lower cost—to products the trustee has already selected." *Sweda*, 923 F.3d at 329.[6]

40.     The plan fiduciaries' duty to monitor all Plan investments, *id.*, is hand-in-glove with the requirement that plan fiduciaries monitor and understand plan expenses. *See Sweda*, 923 F.3d at 328. Expenses, like recordkeeping fees, "can sometimes significantly reduce the value of an account in a" 401(k) plan. *Tibble*, 135 S. Ct. at 1826. Accordingly, cost-conscious management "is fundamental to prudence" because "[w]asting beneficiaries' money is imprudent …." *Tibble*, 843 F.3d at 1197 (citations omitted).[7]

### DEFENDANTS MISMANAGED THE PLAN'S RECORDKEEPING FEES CAUSING MILLIONS OF DOLLARS IN DAMAGES TO PLAN PARTICIPANTS

41.     As detailed *infra*, during the Class Period Defendants failed to negotiate market-rate recordkeeping fees with Merrill Lynch and T. Rowe Price; failed to prudently monitor the recordkeeping fees; and failed to prudently benchmark the recordkeeping fees to ensure these fees

---

[6] Since the Supreme Court's decisions in *Hughes*, courts throughout the country have strictly adhered to the Court's statements and found actionable claims that plan fiduciaries, like Plaintiffs assert here, failed to prudently monitor a plan's recordkeeping costs and investment menu. *See, e.g.*, *Kong v. Trader Joe's Co.*, 2022 WL 1125667, at *1 (9th Cir. Apr. 15, 2022) (reversing order granting motion to dismiss involving claims alleging excessive investment fees in 401(k) plan (citing *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 741 (2022)); *Bangalore v. Froedtert Health Inc.*, 2022 WL 227236, at *1 (E.D. Wis. Jan. 26, 2022); *Goodman v. Columbus Reg'l Healthcare Sys., Inc.*, 2022 WL 228764, at *2 (M.D. Ga. Jan. 25, 2022); *Smith v. Shoe Show, Inc.*, 2022 WL 583569, at *6 (M.D.N.C. Feb. 25, 2022); *Kohari v. MetLife Grp., Inc.*, 2022 WL 3029328, at *4 (S.D.N.Y. Aug. 1, 2022); *Moler v. Univ. of Maryland Med. Sys.*, 2022 WL 2756290, at *5 (D. Md. July 13, 2022).

[7] *See also see also* U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 2 ("You should know that your employer also must consider the fees and expenses paid by your plan. ERISA requires employers to follow certain rules in managing 401(k) plans. Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries."), *available at* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

were appropriate for Plan participants. These breaches of fiduciary duties by Defendants caused millions of dollars in damages to Plan participants.

42.     Administrative services such as recordkeeping, trustee, and custodial services are necessary for the operation of any defined contribution plan and are one of the plan's largest expenses.[8]

43.     "Recordkeeping" in the context of defined contribution plans describes services provided by a plan's primary administrative service provider. These services typically encompass standardized tasks across the recordkeeper marketplace, such as: processing and tracking balances and transactions on participants' accounts; providing a web portal to participants with account, investment, and financial planning information; providing communications to participants including periodic account statements and required disclosures; processing participant loans; providing participants retirement education materials; compliance testing for the plan; form 5500 preparation, a plan's annual submission to the Department of Labor; preparing financial statements; and furnishing the Plan's fiduciaries with participant and investment information to assist with plan administration.

44.     As reflected in the Plan's participant fee disclosures, the Plan's administrative service providers, Merrill Lynch and T. Rowe Price, tracked participants' account balances, maintained Plan assets, generated account statements, and provided a website, customer service, and educational materials, for example.

45.     To protect retirement plan participants, ERISA requires plan fiduciaries to monitor recordkeeping expenses and ensure that they are reasonable. *See* 29 U.S.C. § 1104(a)(1)(A)(ii) ("[A] fiduciary shall discharge his duties ... solely in the interest of participants

---

[8] Consistent with common practice, Plaintiffs use the terms "administrative" and "recordkeeping" fees interchangeably.

... for the exclusive purpose of[] providing benefits ... and *defraying reasonable expenses of administering the plan*[.]") (emphasis added); *Tibble*, 843 F.3d at 1197 ("cost-conscious management is fundamental to prudence" because "[w]asting beneficiaries' money is imprudent ....") (citations omitted).[9]

### Defendants Failed to Prudently
### Monitor, Benchmark, and Negotiate Market-Rate
### Plan Recordkeeping Fees Based On the Plan's Size

46. Recordkeeping costs are a function of the number of plan participants. Thus, the cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants, like the Plan here, leverage economies of scale by negotiating a lower per-participant recordkeeping fee. Defendants, however, failed to leverage these economies of scale to negotiate market-rate recordkeeping fees.

47. Among larger plans, the market for recordkeeping services is competitive, with many recordkeepers equally capable of providing high-level, comparable services. Accordingly, recordkeepers actively compete to provide recordkeeping services to 401(k) plans. Consequently, recordkeeping fees have declined considerably in defined contribution plans since 2000. Between 2006 and 2016, for example, recordkeeping costs decreased by approximately 50% on a per-participant basis and have continued to decline.[10]

---

[9] The DOL and SEC have warned that although the fees and costs associated with investment products and services may seem small, over time they can have a significant impact on an investor's portfolio. *See* DOL, *A Look at 401(k) Plan Fees*, at 1-2, *available at* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (cautioning that 1% difference annually can reduce the investor's account balance at retirement by 28%); SEC Investor Bulletin, *How Fees and Expenses Affect Your Investment Portfolio*, at 1, 3 (2014), *available at* https://www.sec.gov/oiea/investor-alerts-bulletins/ib_fees_expenses.html.

[10] *See* Greg Iacurci, *Adjusting to the Squeeze of Fee Compression*, Investment News (Nov. 9, 2019) *available at* https://www.investmentnews.com/adjusting-to-the-squeeze-of-fee-compression-170635 ("Median fees for record-keeping, trust and custody services for DC plans fell by about half in the decade through 2017, according to most recent figures published by consulting firm

48.     For large plans, like the Plan here, variations in recordkeeping services generally do not materially impact the fees charged by recordkeepers to deliver the services.

49.     The cost of adding an additional participant to a recordkeeping platform is relatively low. These economies of scale are inherent in all recordkeeping arrangements for defined contribution plans, including the Plan. As a plan's participant count increases, the recordkeeper's fixed costs of providing such services are apportioned to a larger population, thereby reducing the average cost of delivering services on a per-participant basis. This is because large recordkeepers invest in the requisite infrastructure to provide recordkeeping and transaction services to their clients (e.g., a website and call center). These costs also do not materially change with the loss or addition of a new plan. When more participants in a plan are on a recordkeeping platform, the recordkeeper apportions its fixed costs across a larger participant base, thereby reducing the per-participant cost.

50.     Similarly, the average cost to a recordkeeper to service a participant's account does not turn on the account balance. That is, in comparatively similar circumstances, it costs a recordkeeper the same amount to provide services to a participant with an account balance of $1,000 as it does to one with a balance of $100,000.

51.     Prudent fiduciaries regularly benchmark a plan's recordkeeping fees. Thus, prudent fiduciaries will regularly ensure that their plan is paying market-rate fees commensurate with its size in the marketplace to determine whether the plan should negotiate a lower fee with the current recordkeeper or seek a new provider that can provide the services at a lower cost to plan participants. In 2010, the Department of Labor specifically noted that "plans normally conduct requests for proposal (RFPs) from service providers at least once every three to five

---

NEPC."); Robert Steyer, *Record-keeping Consolidation Expected to Continue*, Pensions & Investments (Oct. 22, 2020) (noting the continued declines in recordkeeping expenses).

years."[11] Mercer, one of the world's largest asset managers and a leader in retirement plan consulting, published a report in 2013 that was "based on DOL guidelines, case law, and extensive marketplace experience" and emphasized that prudent fiduciaries should "benchmark and negotiate recordkeeping and trustee fees at least every other year."[12] This benchmarking is critical in an increasingly competitive environment with declining fees in the marketplace.

52.     Plan fiduciaries who request their incumbent recordkeeper for a price reduction do not receive as low a price relative to soliciting competitive bids because there is an absence of marketplace pressure.

53.     On January 1, 2012, Merrill Lynch became the Plan's recordkeeper.

54.     In 2016 through 2019, Merrill Lynch collected between $46 and $51 annually per participant for recordkeeping services through, *inter alia*, revenue sharing, a practice whereby mutual fund managers share with a recordkeeper investment fees charged to investors as compensation for the recordkeeper providing services the mutual fund would otherwise provide.

55.     In addition to the compensation collected through, *inter alia*, revenue sharing, in 2017 through 2019 Merrill Lynch charged participants with an account balance an account management fee between $54 and $59 annually for recordkeeping services.

56.     In 2020, T. Rowe Price became the Plan's recordkeeper and charged participants with an account balance a $45 annual recordkeeping fee.

---

[11] Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 75 FR 41600, 41625 (July 16, 2010).

[12] DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance at 1, 4, *available at* https://www.mercer.com/content/dam/mercer/attachments/global/Retirement/DC%20Fee%20Management%20-%20Mitigating%20Fiduciary%20Risk%20and%20Maximizing%20Plan%20Performance.pdf.

57.     The average number of Plan participants between 2016 and 2021 was approximately 26,000.

58.     The recordkeeping fees Defendants allowed Merrill Lynch to charge to Plan participants were higher than comparably-sized defined contribution plans during the Class Period, showing the Defendants failed to prudently monitor and benchmark these fees, causing the Plan to overpay millions of dollars for recordkeeping services. Before 2016, a prudent fiduciary of a plan with a similar number of participants could have negotiated comparable recordkeeping services of similar or superior quality for $30 to $35 per participant, or lower. *See infra* ¶ 60.

59.     That a recordkeeper, T. Rowe Price, was willing to charge lower recordkeeping fees in 2020 for comparable services demonstrates the Plan fiduciaries caused the Plan to overpay for recordkeeping fees. And, as explained *infra*, ¶ 60, when changing recordkeepers from Merrill Lynch to T. Rowe Price, Defendants failed to prudently negotiate the recordkeeping fees, causing the Plan to continue to pay above market-rate for these services.

60.     That Defendants allowed T. Rowe Price to charge Plan participants a $45 annual recordkeeping fee in 2020 reflects a flawed process in evaluating and negotiating, if at all, recordkeeping fees for the Plan. *See, e.g.*, *Gordon v. Mass. Mutual Life Ins. Co*, Case No. 13-cv-30184, ECF No. 1, Complaint, ¶ 28, ECF No. 107-2 at ¶ 10.4 (D. Mass. June 15, 2016) (401(k) fee settlement committing a plan with approximately 14,000 participants to pay not more than $35 per participant for recordkeeping services)*; Terraza v. Safeway Inc*., Case No. 16-cv-03994, 2019 WL 1059688, at *3 (N.D. Cal. Mar. 6, 2019) (plaintiffs' expert testified and provided example of a 401(k) plan with 32,000 participants that paid a $35 per participant recordkeeping fee before 2016); *Tracey v. Mass. Inst. of Tech*., Case No. 16-cv-11620,  404 F. Supp. 3d 356,

363 (D. Mass. 2019) (defined contribution plan with approximately 14,000 plan participants paid annual per participant recordkeeping fee of $33 in 2014); *Brotherston v. Putnam Invs., LLC*, Case No. 15-cv-13825-WGY, 2017 WL 1196648, at *3 (D. Mass. Mar. 30, 2017) (finding at summary judgment that a 401(k) with 6,000 participants paid annual per participant recordkeeping fee of $38 in 2008).

61.     Moreover, Plan fiduciaries could have secured reduced pricing on recordkeeping services based on T. Rowe Price including its proprietary investment options in the Plan, *infra* ¶¶ 64-65, from which T. Rowe Price annually collects thousands of dollars in investment fees to the detriment of Plan participants.

62.     Thus, by taking, or failing to take, the actions described above, Defendants failed to prudently monitor, regularly benchmark, and prudently negotiate market-rate recordkeeping fees based on the number of Plan participants.

### DEFENDANTS MISMANAGED THE PLAN'S INVESTMENT OPTIONS

63.     Compounding the failure to prudently monitor the Plan's recordkeeping fees, Defendants mismanaged the Plan's investment options.

### *Defendants Imprudently Allowed T. Rowe Price to Include Underperforming, Expensive Proprietary Investments in the Plan*

64.      In connection with removing four investment offerings from the Plan menu in 2019, Defendants allowed T. Rowe Price's proprietary fund—the T. Rowe Price Overseas Stock Fund—to replace a fund that had substantially outperformed the T. Rowe Price fund in the preceding five-year period and has continued to do so. ERISA requires and industry experts reinforce that a plan fiduciary cannot incautiously accept a service provider's recommendations

when, *inter alia*, determining whether an investment should be included in a plan.[13] To prudently evaluate an actively managed fund (such as the T. Rowe Price fund) for inclusion in the Plan required the Plan fiduciaries to evaluate historical performance. The comparative performance data between the T. Rowe Price Overseas Stock Fund and the investment it replaced, the Thornburg Global Opportunities fund, shows the Plan fiduciaries failed to prudently evaluate the propriety of replacing the Thornburg Global Opportunities fund.

| Investment Added | Investment Replaced | T. Rowe Price Overseas Stock Fund Performance Delta from 2012 to 2018 | T. Rowe Price Overseas Stock Fund Performance Delta from 2019 to Present | Total Delta from 2012 to Present |
|---|---|---|---|---|
| T. ROWE PRICE OVERSEAS STOCK FUND I | THORNBURG GLOBAL OPPORTUNITIES R5 | -27.82% | -26.33% | -54.15% |

65. Nearly a year and a half after the July 2019 changes to the Plan's investment menu, in December 2020, Defendants admitted failure to continuously monitor each of the Plan's investment offering necessitated an overhaul of the Plan menu. Defendants replaced thirteen investment offerings. In connection with the delayed changes to the Plan's investment offerings in December 2020, Plan fiduciaries again permitted T. Rowe Price to replace an incumbent fund—with the second most assets in the Plan—with its proprietary fund, the T. Rowe Price Growth Stock Fund. Alternatives, in both actively managed and index funds, had outperformed the T. Rowe Price fund and their expense ratios were virtually identical or cheaper.

---

[13] *See, e.g.*, *Cunningham v. Cornell*, Case No. 16-cv-6525, ECF No. 226-2, Expert Report, ¶ 29 ("The fiduciary must not blindly rely on the advice of a consultant in carrying out its fiduciary obligations.").

| INVESTMENT ADDED AND ALTERNATIVES | PERFORMANCE DELTA 2015-2019 (%) | PERFORMANCE DELTA 2020 TO PRESENT (%) | EXPENSE RATIO IN 2020 |
|---|---|---|---|
| T. ROWE PRICE GROWTH STOCK FUND<br><br>INVESTMENT CATEGORY: *LARGE GROWTH* | **-8.21%** | **-41.23%** | 0.52% |
| MORGAN STANLEY INSTITUTIONAL GROWTH | | | 0.53% |
| | | | |
| T. ROWE PRICE GROWTH STOCK FUND | **-0.92%**[14] | **-17.38%** | 0.52% |
| FIDELITY LARGE CAP GROWTH INDEX | | | 0.04% |
| | | | |
| T. ROWE PRICE GROWTH STOCK FUND | **-1.01%** | **-17.32%** | 0.52% |
| TIAA-CREF LARGE-CAP GROWTH INDEX INSTITUTIONAL | | | 0.05% |

***Defendants Failed to Prudently Monitor
and Consider Prudent Alternatives to Mutual Funds with Lower Fees***

66.     During the Class Period Defendants failed to prudently select and monitor the Plan's investment offerings and ensure that Plan participants were charged appropriate and reasonable fees for the Plan's investment options.

67.     The relationship between an investment's fees—generally in the form of an expense ratio, i.e., the total annual cost to an investor for fund-related expenses—and the effect on retirement account values is well-established. A minor increase in a fund's expense ratio can considerably reduce retirement savings, even more so when the monetary consequence of interest compounding is measured.

---

[14] The Fidelity Large Cap Growth Index Fund's inception date is 2017. The performance history reflects a three-year comparison from 2017 through 2019.

68.     On average, there are lower expense ratios for 401(k) participants than those for other investors.[15] ERISA-mandated monitoring of investments requires plan fiduciaries to continually evaluate performance and fees, which results in significant competition among companies offering investment products for 401(k) in the marketplace. The large average account balances of 401(k) plans—especially sizable plans like TTEC's with substantial assets under management and a high number of plan participants—lead to economies of scale and discounted pricing within investment products.

69.     <u>Investment Share Classes</u>.  Many mutual funds offer different classes of shares in a single fund that are targeted toward investors with varying purchase power. Each share class has the identical investment objective of the fund and the same fund manager. More expensive share classes are generally targeted at smaller, retail investors with less bargaining, while lower cost shares are targeted at institutional-type investors, like the Plan, with more assets, and therefore greater bargaining power.

70.     It is well-known that mutual fund companies will typically waive an investment minimum to secure a lower share class for a large plan to add the fund to a large plan. Courts find that because "share classes provide identical investments at lower costs" ERISA mandates "a fiduciary—who indisputably has knowledge of alternative share classes—to switch share classes immediately." *Tibble v. Edison Int'l*, 2017 WL 3523737, at *13 (C.D. Cal., Aug. 16, 2017) (alteration from original); *Garcia v. Alticor, Inc.*, 2021 WL 5537520, at *6 (W.D. Mich. Aug. 9, 2021).

71.     <u>Collective Trusts</u>.  Defendants, as Plan fiduciaries, must be continually mindful of investment options to ensure they do not unduly risk plan participants' savings and do not

---

[15] The Brightscope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) plans, 2018, at 51, *available at* https://www.ici.org/system/files/2021-07/21_ppr_dcplan_profile_401k.pdf at 51.

charge unreasonable fees. Toward that end collective trusts are superior investment vehicles, which pool plan participants' investments and provide lower fee alternatives to even institutional and 401(k) plan specific share classes of mutual funds.

72.     Collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds, and cash. Collective trusts have simple disclosure requirements and can neither advertise nor issue formal prospectuses. Consequently, with less or no administrative costs, and less or no marketing or advertising costs, their costs are lower.

73.     Due to their potential to reduce overall plan costs, collective trusts have become increasingly popular. A study published in 2017, the underlying data for which was compiled from senior executives in the retirement plan marketplace, found "very few plan sponsors" were "not considering" collective investment trusts "as an option" because industry "experts" found the "relative cost savings over mutual funds being in the 10 to 30 basis point range."[16]   Thus, a prudent fiduciary managing a plan with significant assets under management will evaluate using collective trusts, and in most cases, will elect to largely exit mutual funds.[17]

74.     During the Class Period, Defendants overwhelmingly offered mutual funds to Plan participants without monitoring or considering prudent investment alternatives, including alternatives with lower fees.

---

[16] Collective Investment Trust a Perfect Storm, March 2017, at 23 (discussing as of 2017 the growing popularity of collective investment trusts 401(k) plans), *available at* https://www.ctfcoalition.com/portalresource/AMWCollectiveInvestmentTrustsAPerfectStorm-030317.pdf.

[17] In fact, given collective trusts' "lower costs" to retirement savers, Congress has recently considered passing the Enhancement American Retirement Now Act, which would expand access of collective trusts to 403(b) defined contribution plans, which currently cannot offer collective trusts to participants. *See* https://www.finance.senate.gov/imo/media/doc/EARN%20Act%20section%20by%20section%20summary1.pdf.

*Defendants Admit They Failed to*
*Continuously Monitor the Plan's Investment*
*Offerings and Remove Four Investments from the Plan Menu*

75.     In July 2019, Defendants acknowledged they failed to regularly review the Plan's investment options. In announcing the removal of four investment options from the Plan, Defendants admitted: "***Periodically***, TTEC reviews the Plan to ensure the investment choices available to you continue to suit the Plan's objectives …." *See* Ex. A, Plan Announcement (emphasis added). That is, Defendants acknowledged that instead of reviewing the Plan's investment offerings continuously—as required by ERISA—Defendants did so occasionally or from time to time. *Tibble*, 575 U.S. at 529 (holding the fiduciary duty of prudence includes "a continuing duty to monitor trust investments and remove imprudent ones").

76.     Defendants, for example, from 2016 to 2018 caused an expense ratio of—0.30%—to be imposed on Plan participants for investing in the only index fund offered to Plan participants during that period. In a report published in 2018, a leading source of investment analysis and commentary, Dow Jones & Co., found that investment expenses have continually declined over the years and in ***2000***, the average expense ratio for an index fund offered to a retail investor with no bargaining power was lower—0.27%—than the expense ratio Defendants imposed on Plan participants from 2016 to 2018.[18]

77.     This fee was outrageous because the average expense ratio of an index fund for the Plan's size was 8 basis points (0.08%), or more than three times cheaper than the investment fee Defendants imposed on Plan participants the fund during that period.[19]

---

[18] Investors Might Be Paying Too Much for These Index Funds, *available at* https://www.barrons.com/articles/some-index-funds-charge-higher-fees-51546035074.

[19] Brightscope/ICI Defined Contribution Plan Profile, A Close Look at 401(k) Plans, at 59, *available at* https://www.ici.org/system/files/2021-07/21_ppr_dcplan_profile_401k.pdf.

| Plan assets | Domestic | International | Target date mutual funds* | Non-target date balanced mutual funds | Domestic | International | Money market mutual funds | Other | Memo: index mutual funds |
|---|---|---|---|---|---|---|---|---|---|
| $1M to $10M | 0.59 | 0.79 | 0.54 | 0.58 | 0.56 | 0.66 | 0.41 | 0.73 | 0.14 |
| >$10M to $50M | 0.51 | 0.69 | 0.47 | 0.48 | 0.47 | 0.58 | 0.34 | 0.70 | 0.11 |
| >$50M to $100M | 0.46 | 0.61 | 0.42 | 0.43 | 0.40 | 0.54 | 0.28 | 0.67 | 0.09 |
| >$100M to $250M | 0.44 | 0.57 | 0.40 | 0.38 | 0.37 | 0.55 | 0.24 | 0.64 | 0.08 |

78.     Defendants' failure to continuously monitor the Plan investment menu necessitated a Plan overhaul.

79.     In December 2020 the Defendants admitted failure to continuously review each investment offering in the Plan necessitated an overhaul of the Plan's investment menu, reflecting a flawed process whereby the Plan fiduciaries had acknowledged to only have "periodically" reviewed the Plan's investment offerings during the Class Period, resulting in considerable losses to Plan participants. The chart below illustrates some of the excess investment fees incurred by Plan fiduciaries' failure to conduct a continuous review of the Plan's investment offerings.

| INVESTMENT REPLACED | 2020 EXPENSE RATIO | REPLACEMENT INVESTMENT | 2020 EXPENSE RATIO | % FEE EXCESS |
|---|---|---|---|---|
| TIAA-CREF INFLATION LINKED BOND FUND ADVISOR | 0.34% | FIDELITY INFLATION-PROTECTED BOND INDEX FUND | 0.05% | >600% |
| AMERICAN FUNDS AMERICAN BALANCED FUND, R6 | 0.26% | VANGUARD TARGET RETIREMENT DATE FUND | 0.13%-0.15% | 175%-200% |
| PIMCO COMMODITIES PLUS STRATEGY FUND, INSTITUTIONAL | 1.01% | VANGUARD TARGET RETIREMENT DATE FUND | 0.13%-0.15% | 675%-775% |
| WELLS FARGO STABLE VALUE FUND, O | 0.60% | T. ROWE PRICE STABLE VALUE COMMON TRUST-N | 0.20% | 300% |

80.    Each replacement investment above and comparable alternatives in the same investment category were available for inclusion in the Plan before 2016.

81.    In connection with the December 2020 overhaul of the Plan's investment menu, two of the funds Defendants replaced, the American Fund Balanced R6 and the TIAA-CREF Inflation Link, had underperformed the benchmark index in the Plan's 2020 fee disclosure on a one, five, and ten-year period (or since its inception), further underscoring Defendants imprudently monitored the Plan menu by failing to timely remove these investment offerings.

82.    Plan fiduciaries also failed to secure cheaper share classes in mutual funds that were available during the Class Period:

| INVESTMENT | SHARE CLASS IMPOSED | EXPENSE RATIO IN 2020 | SHARE CLASS AVAILABLE | EXPENSE RATIO | FEE EXCESS % |
|---|---|---|---|---|---|
| VICTORY SYCAMORE ESTABLISHED VALUE | Institutional | 0.60% | R6 | 0.57% | 0.03% |
| DELAWARE IVY HIGH INCOME | Institutional | 0.73% | R6 | 0.58% | 0.15% |
| EATON VANCE ATLANTA CAPITAL SMID | Institutional | 0.92% | R6 | 0.82% | 0.10% |
| TIAA-CREF INFLATION LINK BOND FUND | Advisor | 0.34% | Institutional | 0.24% | 0.10% |

*Defendants Imprudently Managed*
*the Plan Without an Investment Policy Statement*

83.    It is a well-established prudent fiduciary practice for plan fiduciaries to implement an investment policy statement ("IPS"), which governs the plan fiduciaries' investment decisions and serves as a functional guardrail for a plan's investment menu. A standard IPS prescribes, *inter alia*, criteria for the selection, retention, monitoring, and removal of plan investments. Before

2014, most plan sponsors had adopted an IPS. *Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, 2017 WL 2655678, at \*2 (C.D. Cal. June 15, 2017) (expert testimony emphasizing that the defendant had failed to adopt an IPS until late 2014). In fact, in 2001, nearly two decades before Defendants adopted an IPS, Merrill Lynch, the Plan's recordkeeper and trustee during most of the Class Period, observed a "written investment policy statement establishes criteria and benchmarks that are important to the successful management of defined contribution plan investments. Approximately half of defined contribution plan sponsors have described their investment decision-making procedures in a written form via investment policy statements." *In re WorldCom, Inc. ERISA Litig.*, 354 F. Supp. 2d 423, 434 (S.D.N.Y. 2005).

84.     Based on an agreement TTEC entered with Merrill Lynch on November 29, 2017, Defendants failed to implement an IPS until, at the earliest, December 2017. The agreement states:

> (b) <u>Investment Policy Statement Creation</u>: Merrill Lynch shall assist the Client in creating a written investment policy statement (an "Investment Policy Statement" or "IPS"), for the purpose of providing guidelines, limitations and direction for the selection and monitoring of the investment choices in the plan. Merrill Lynch shall draft an IPS for the Client's review and approval based on the information provided by the Client. Merrill Lynch shall review the IPS with the Client, and the Client shall decide whether and how to adopt and/or implement the IPS. The Client is responsible for the final approval of the Plan's IPS.

### *Defendants Failed to Timely Include Target Retirement Date Funds to the Plan*

85.     Defendants waited until late 2019 to add five Vanguard target retirement date funds to the Plan's investment menu.

86.     A target retirement date fund is an investment vehicle designed to offer a comprehensive retirement solution through a portfolio of underlying funds that, over an investor's time horizon, gradually shifts to become more conservative as the target retirement year approaches. Target date funds are "widely used because they are a convenient investment choice

for retirement savers[.]"[20] "By offering both portfolio diversification at every point in time and automatic rebalancing over time, they help savers of all ages manage their asset allocations as they build their retirement nest eggs." *Id.*

87.    There is no justifiable reason for the Plan fiduciaries having omitted an entire investment *category*[21] given a prudent fiduciary would have done so by the beginning of the Class Period or prior. In 2016—years before Defendants added the target retirement date investment category  to the Plan—such funds were offered to more than eighty-five percent of participants in defined contribution plans of the Plan's size.[22] The Plan fiduciaries' eventual, though delayed, inclusion of target retirement date funds to the Plan demonstrates their absence was improper.

## CLASS ACTION ALLEGATIONS

88.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):

> All persons who were participants in or beneficiaries of the Plan, between August 25, 2016 to the present, excluding any persons with responsibility of the Plan's investment or administrative functions (the "Class Period").

89.    The members of the Class are so numerous that joinder of all members is impractical.

90.    Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries from Defendants'

---

[20] Investment Company Institute, News Release, Target Date Funds Remain Popular in 401(k) Plans, *available at* https://www.ici.org/news-release/21_news_tdf.

[21] *See* Brightscope/ICI Defined Contribution Profile: A Close Look at 401(k) Plans, 2016, at 30-31 (demonstrating the standard investment categories in 401(k) plans include target date retirement funds, domestic and international equity funds, bond funds, and capital preservation funds) *available at*  https://www.ici.org/system/files/2021-07/21_ppr_dcplan_profile_401k.pdf.

[22] *See* Brightscope/ICI Defined Contribution Profile: A Close Look at 401(k) Plans, 2016, at 31 *available at*  https://www.ici.org/doc-server/pdf%3A20_ppr_dcplan_profile_403b.pdf.

mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

91.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to: whether Defendants are fiduciaries of the Plan; whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein; whether TTEC failed to adequately monitor the Employee Benefits Committee, and in turn, whether Committee members monitored other fiduciaries to ensure the Plan was being managed in compliance with ERISA; the proper form of equitable and injunctive relief; and the proper measure of monetary relief.

92.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in complex class litigation and ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

93.     This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests

of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

## FIRST CLAIM FOR RELIEF

### Breaches of Fiduciary Duty of Prudence

94.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

95.     At all relevant times, the Defendants were fiduciaries of the Plan within the meaning of ERISA in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets. 29 U.S.C. § 1002(21)(A).

96.     As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA. 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

97.     Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Defendants: (1) failed to prudently monitor, regularly benchmark, and prudently negotiate the Plan's recordkeeping fees; (2) allowed T. Rowe price to include proprietary investments in the Plan that historically and subsequently underperformed the replaced fund and/or were more expensive investments; (3) failed to prudently consider alternatives to mutual funds in the Plan, despite the alternatives' lower fees; (4) admitted to have only "periodically" reviewed the Plan's investment options to ensure they were suitable for Plan participants—in dereliction of their duty to continually monitor *inter alia*, each investment offering—causing Plan participants to incur excessive investment fees; (5) administered the Plan

during the Class Period without crucial protocol—namely, an investment policy statement—to monitor the Plan investment menu; and, (6) failed to timely include target retirement date funds in the Plan's investment menu. As a result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had accumulated more retirement savings.

98.      Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties.

99.      Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

100.      Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendants' own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## SECOND CLAIM FOR RELIEF

### Failure to Adequately Monitor Other Fiduciaries

101.      Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

102.      The power to appoint, retain, and remove plan fiduciaries constitutes discretionary authority over the management or administration of a plan within the meaning of ERISA. 29 U.S.C. § 1002(21)(A).

103.    TTEC designated the Employee Benefits Committee to act as the Plan administrator.

104.    Similarly, while it was the Plan sponsor and Plan administrator, TTEC was a fiduciary of the Plan pursuant to 29 U.S.C. § 1002(21)(A). While it was a fiduciary, TTEC had a responsibility to monitor the performance of the Employee Benefits Committee and the Committee Defendants to ensure that they were complying with the terms of the Plan and ERISA's statutory standards.

105.    The Employee Benefits Committee, as a body of fiduciaries, in turn, is responsible for monitoring the performance of the Committee Defendants. The Committee Defendants were required to monitor the performance of other Employee Benefits Committee members.

106.    A monitoring fiduciary must ensure that fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets, and must take prompt and effective action to protect the plan and participants when the fiduciaries are not meeting their fiduciary obligations.

107.    TTEC and the Employee Benefits Committee breached their fiduciary monitoring duties by failing, *inter alia*, to monitor the Committee Defendants' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein.

108.    Consequently, the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses due to excessive investment fees, recordkeeping fees, and investment underperformance.

109.    Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Defendants are liable to restore to the Plan all losses suffered from their failure to properly monitor the Employee

Benefits Committee. Defendants are additionally liable for additional equitable relief and other relief as provided by ERISA and applicable law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Elijah Carimbocas, Linda Dlhopolsky, and Morgan Grant  as representatives of the Class defined herein, and on behalf of the Plan, pray for relief as follows:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A declaration that Defendants breached their fiduciary duties under ERISA;

D.    An order compelling TTEC to personally make good to the Plan all losses that the Plan incurred from the breaches of fiduciary duties described herein, and to restore the Plan to the position it would have been in but for this unlawful conduct;

E.    An order granting equitable restitution and other appropriate equitable monetary relief against Defendants;

F.    An order enjoining Defendants from any further violations of ERISA;

G.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate;

H.    An award of pre-judgment interest;

I.    An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine; and

J.    An award of such other and further relief as the Court deems equitable and just.


Respectfully submitted,

Dated:  August 25, 2022

/s/ *Bernard K. Schott*
One of Plaintiffs' Attorneys

Douglas M. Werman
Bernard K. Schott

30

**WERMAN SALAS P.C.**
77 W. Washington St., Suite 1402
Chicago, IL 60602
Telephone: (312) 419-1008
dwerman@flsalaw.com
bschott@flsalaw.com

Daniel M. Hutchinson
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: 415.956.1000
dhutchinson@lchb.com

Anne B. Shaver (CO Bar No. 39933)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
1890 Gaylord St.
Denver, CO 80206
Telephone: 415.956.1000
ashaver@lchb.com