## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

ELIJAH CARIMBOCAS, LINDA
DLHOPOLSKY, AND MORGAN GRANT, on
behalf of themselves and others similarly
situated,

     *Plaintiffs*,

v.

TTEC SERVICES CORPORATION, TTEC
SERVICES CORPORATION EMPLOYEE
BENEFITS COMMITTEE, EDWARD
BALDWIN, K. TODD BAXTER, PAUL
MILLER, REGINA PAOLILLO, EMILY
PASTORIUS, and JOHN AND JANE DOES 1-
20,

     *Defendants*.

Civil Action No. 1:22-cv-02188-CNS-STV

Hon. Charlotte N. Sweeney

Magistrate Judge Scott T. Varholak

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Elijah Carimbocas, Linda Dlhopolsky, and Morgan Grant ("Plaintiffs"), by and through their attorneys, on behalf of the TTEC 401(k) Profit Sharing Plan (f/k/a TeleTech 401(k) Profit Sharing Plan) (the "Plan"), themselves and all others similarly situated, state and allege as follows:

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against TTEC Services Corporation ("TTEC"), TTEC Services Corporation Employee Benefits Committee,  and any former committees serving a comparable function ("Employee Benefits Committee"), Edward Baldwin, K. Todd Baxter, Paul Miller, Regina Paolillo, and Emily Pastorius, who are current or

former Employee Benefits Committee members, and other current and former members (collectively, the "Committee Defendants"), for breaches of their fiduciary duties.

2.     Defined contribution retirement plans, like the Plan, confer tax benefits on participating employees to encourage the accumulation of retirement savings. As of June 2021, 401(k) plans "held an estimated 7.3 trillion in assets" in the United States.[1]

3.     In a 401(k) plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l,* 575 U.S. 523, 525 (2015). In other words, the negative consequences of a plan's high fees and poorly-performing investments fall squarely on the participants in a 401(k) plan.

4.     To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries, requiring, respectively, that plan fiduciaries act "solely in the interest of the participants and beneficiaries," and with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1), (B).

5.     401(k) plans of a certain size generally have bargaining power to negotiate reasonable fees and expenses for Plan administration and recordkeeping. Specifically, once a 401(k) plan reaches over $100 million in plan assets, plans can generally receive available market rates. For example, the 401k Averages Book[2] is a commonly used resource guide within the pension industry, which provides comprehensive and accurate data regarding market rate fees. In

---

[1] *See* Investment Company Institute FAQs, *available at* https://www.ici.org/faqs/faq/401k/faqs_401k.

[2] 401k Averages Book, 22nd edition.

this published survey, the average annual per participant cost for recordkeeping and administration is $13 for a plan with over 2,000 participants and $200 million in assets.

6.       As of the end of 2022, the Plan had over $285 million dollars in assets entrusted to the care of the Plan's fiduciaries. The Plan's assets under management place it in the top 0.4% of defined contribution plans in the United States and the top 0.1% based on the number of participants.[3] Given the Plan's size, it had more than adequate bargaining power to negotiate reasonable fees and expenses for Plan administration and recordkeeping.

7.       During the putative Class Period[4] Defendants flagrantly breached fiduciary duties they owed to the Plan, to Plaintiffs, and other Plan participants, causing millions of dollars in damages to Plan participants. Defendants, among other breaches of their fiduciary duties detailed herein: (1) failed to prudently monitor the Plan's recordkeeping fees; (2) failed to regularly benchmark the Plan's recordkeeping fees; (3) failed to prudently negotiate the Plan's recordkeeping fees; and (4) caused Plan participants to incur excessive investment fees.

8.       Plaintiffs, accordingly, assert claims against Defendants for breach of the fiduciary duties of prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.    JURISDICTION AND VENUE

9.       This case presents a federal question under ERISA, and therefore this Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

---

[3] *See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2018, at 7, *available at* https://www.ici.org/system/files/2021-07/21_ppr_dcplan_profile_401k.pdf (describing the methodology used to compute the percentages as analyzing Form 5500s, which are mandatory filings with U.S. Department of Labor and "include the number of plan participants, assets held in the plan, and other plan features.").

[4] *See infra* ¶ 79.

10.     Plaintiffs bring this action pursuant to 29 U.S.C. § 1132(a)(2), which permits participants in an employee retirement plan to pursue a civil action on behalf of the plan to remedy breach of fiduciary duties.

11.     The Court has personal jurisdiction over TTEC and the Employee Benefits Committee because TTEC is headquartered and transacts business in this District, resides in this District, and/or has significant contacts with this District.

12.     The Court has personal jurisdiction over Edward Baldwin, K. Todd Baxter, Paul Miller, Regina Paolillo, and Emily Pastorius because ERISA confers nationwide personal jurisdiction and these individuals reside in and have sufficient ties with the United States. 29 U.S.C. § 1132(e).

13.     Venue is proper in this District pursuant to 29 U.S.C. § 1132(e)(2), because the Plan is administered in this District, some or all of the violations of ERISA occurred in this District, and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.     PARTIES & THE PLAN'S NON- PARTY SERVICE PROVIDERS

### A.     Plaintiffs

14.     Plaintiff Elijah Carimbocas resides in Arizona. During his employment with TTEC, Plaintiff Carimbocas participated in and made regular contributions to the Plan.

15.     Plaintiff Linda Dlhopolsky resides in Pennsylvania. During her employment with TTEC, Plaintiff Dlhopolsky participated in and made regular contributions to the Plan.

16.     Plaintiff Morgan Grant resides in Texas. During her employment with TTEC, Plaintiff Grant participated in and made regular contributions to the Plan.

17.     Plaintiffs did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed. Plaintiffs have limited knowledge of Defendants' flawed decision-making process with respect to the Plan, because this information is largely within the sole possession of Defendants. Having never managed a 401(k) plan the size of the Plan, Plaintiffs lacked actual knowledge of reasonable fee levels and prudent alternatives available to such plans.

18.     Plaintiffs' claims are premised on Defendants' common misconduct in administering "the entire Plan" and, consequently, they have constitutional standing to seek relief on behalf of the entire Plan irrespective that Plaintiffs did not invest in all the Plan's investment offerings during the Class Period. *Kurtz v. Vail Corp.*, 511 F. Supp. 3d 1185, 1193 (D. Colo. 2021) (collecting cases).

**B.     TTEC**

19.     Defendant TTEC is domiciled in the state of Colorado. The Company describes itself as a global customer experience technology and services company focused on the design, implementation, and delivery of customer service platforms in various industries. TTEC employs individuals throughout the United States.

20.     TTEC is the Plan's Sponsor and a Plan administrator. TTEC is a fiduciary of the Plan because it exercised discretionary authority and control relative to management of the Plan and/or exercised authority or control relative to disposition of Plan assets and was responsible for determining the investment options available under the Plan. 29 U.S.C. § 1002(21)(A).[5]

---

[5] ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." 29 U.S.C. § 1102(a)(1).

21.     To the extent that TTEC delegated any of its fiduciary functions to others, such as the Employee Benefits Committee, *infra*, it maintained fiduciary responsibilities with respect to the Plan. The authority to appoint, retain, and remove other plan fiduciaries constitutes discretionary authority or control over the management or administration of the plan, and thus confers fiduciary status under 29 U.S.C. § 1002(21)(A); *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1465 (4th Cir. 1996) ("[T]he power ... to appoint, retain and remove plan fiduciaries constitutes 'discretionary authority' over the management or administration of a plan within the meaning of § 1002(21)(A)."). Further, the responsibility for appointing other fiduciaries establishes a corollary duty to monitor the appointed fiduciaries to ensure that they are complying with the terms of the Plan and ERISA's fiduciary standards. *See* 29 C.F.R. § 2509.75-8 (FR-17); *Vellali v. Yale Univ.*, 308 F. Supp. 3d 673, 691 (D. Conn. 2018) ("ERISA law imposes a duty to monitor appointees on fiduciaries with appointment power.") (quotation omitted).

## C.     The Employee Benefits Committee

22.     TTEC created and designated the Employee Benefits Committee to, *inter alia*, administer the Plan, determine the appropriateness of the Plan's investment offerings, and monitor the investments' performance. The Employee Benefits Committee is a fiduciary of the Plan because it exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets. 29 U.S.C. § 1002(21)(A).

23.     The Committee and each of its members were fiduciaries of the Plan during the Class Period within the meaning of ERISA because each exercised discretionary authority over management or disposition of Plan assets. *Id.*

24.     Edward Baldwin is a current or former member of the Employee Benefits Committee.

25.     Paul Miller is a current or former member of the Employee Benefits Committee.

26.     Emily Pastorious is a current or former member of the Employee Benefits Committee.

27.     Regina Paolillo is a current or former member of the Employee Benefits Committee.

28.     K. Todd Baxter is a current or former member of the Employee Benefits Committee.

29.     The Committee and the current and former named and unnamed members of the Committee during the Class Period, the latter referred individually as John and Jane Does 1-20, are collectively referred herein as the "Committee Defendants." The identities of the Doe Defendants are not currently known to Plaintiffs.

**D.     Non-Party Service Providers**

30.     From January 1, 2012 to December 31, 2019, Merrill Lynch was the Plan's recordkeeper and trustee.[6]

31.     From January 1, 2020, T. Rowe Price has been the Plan's recordkeeper and trustee.

## IV.    LEGAL BACKGROUND

32.     ERISA imposes strict fiduciary duties of loyalty and prudence upon fiduciaries of retirement plans, requiring in relevant part that:

> [A] fiduciary … discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A) for the exclusive purpose of:
> (i) providing benefits to participants and their beneficiaries; and
> (ii) defraying reasonable expenses of administering the plan;

---

[6] Merrill Lynch is a company of Bank of America, N.A., which served as the Plan's trustee.

> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]

29 U.S.C. § 1104(a).

33.     These ERISA fiduciary duties are "the highest known to the law." *Troudt v. Oracle Corp.*, No. 116CV00175REBCBS, 2017 WL 663060, at \*5 (D. Colo. Feb. 16, 2017) (quotation omitted). "A fiduciary's process must bear the marks of loyalty, skill, and diligence expected of an expert in the field." *Sweda v. Univ. of Pa.*, 923 F.3d 320, 329 (3d Cir. 2019) (quotation omitted), *cert. denied*, 140 S. Ct. 2565 (2020). "It is not enough to avoid misconduct, kickback schemes, and bad-faith dealings. The law expects more than good intentions." *Id.* "A pure heart and an empty head are not enough." *Id.* (quotation omitted).

34.     ERISA's "prudent person" standard evaluates, *inter alia*, "fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). Plan fiduciaries, the Supreme Court recently reinforced, have a continuing duty to monitor and remove imprudent plan investments, which mandates a continuous and systematic review of the investments to ensure they are suitable. *Divane v. Northwestern Univ.*, 142 S. Ct. 737, 740-41 (2022); *Tibble*, 575 U.S. at 530 (holding the fiduciary duty of prudence includes "a continuing duty to monitor trust investments and remove imprudent ones").

35.     In *Divane*, the Supreme Court explained, "even in a defined-contribution plan where participants choose their investments, plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options." *Id.* Separate from the duty to select prudent investments, this duty requires plan fiduciaries to remove "*any*" imprudent investment offerings, irrespective of whether lower cost options are available in the investment menu. *Id.* (emphasis added). "Fiduciaries must" also "consider a plan's

power ... to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." *Sweda*, 923 F.3d at 329.[7]

36.     The plan fiduciaries' duty to monitor all Plan investments, *id.*, is hand-in-glove with the requirement that plan fiduciaries monitor and understand plan expenses. *See Sweda*, 923 F.3d at 328. Expenses, like recordkeeping fees, "can sometimes significantly reduce the value of an account in a" 401(k) plan. *Tibble*, 575 U.S, at 525. Accordingly, cost-conscious management "is fundamental to prudence" because "[w]asting beneficiaries' money is imprudent …." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016) (citations omitted).[8]

## V.     FACTUAL ALLEGATIONS

### A.     The Plan

37.      The Plan is a single-employer "defined contribution" plan in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed

---

[7] Since the Supreme Court's decisions in *Hughes*, courts throughout the country have strictly adhered to the Court's statements and found actionable claims that plan fiduciaries, like Plaintiffs assert here, failed to prudently monitor a plan's recordkeeping costs and investment menu. *See, e.g.*, *Kong v. Trader Joe's Co.*, 2022 WL 1125667, at *1 (9th Cir. Apr. 15, 2022) (reversing order granting motion to dismiss involving claims alleging excessive investment fees in 401(k) plan (citing  *Hughes*, 142 S. Ct. at 741); *Bangalore v. Froedtert Health Inc.*, 2022 WL 227236, at *1 (E.D. Wis. Jan. 26, 2022); *Goodman v. Columbus Reg'l Healthcare Sys., Inc.*, 2022 WL 228764, at *2 (M.D. Ga. Jan. 25, 2022); *Smith v. Shoe Show, Inc.*, 2022 WL 583569, at *6 (M.D.N.C. Feb. 25, 2022); *Kohari v. MetLife Grp., Inc.*, 2022 WL 3029328, at *4 (S.D.N.Y. Aug. 1, 2022); *Moler v. Univ. of Maryland Med. Sys.*, 2022 WL 2756290, at *5 (D. Md. July 13, 2022).

[8] *See also* U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 2 ("You should know that your employer also must consider the fees and expenses paid by your plan. ERISA requires employers to follow certain rules in managing 401(k) plans. Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries."), *available at* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf.

to those accounts (and any income, expense, and gains and losses, which may be allocated to such participant's account). 29 U.S.C. § 1002(34).

38.     Teletech Holdings, Inc. established the Plan in 1991, and it was previously named the TeleTech 401(k) Profit Sharing Plan. Teletech Services Corporation was the previous Plan Sponsor. Over the years, TTEC and its predecessors have acquired other companies, who have adopted the Plan.

39.     All employees of TTEC are generally eligible to participate in the Plan. Subject to limited exceptions, employees are automatically enrolled in the Plan, and TTEC automatically withholds compensation from the participant's paycheck each payroll period for pre-tax contributions to the Plan unless the participant affirmatively elects otherwise.

40.     Plan participants may allocate their contributions among the investment options offered by the Plan, as selected by Employee Benefits Committee. According to Plan documents, during the Class Period if a participant failed to make any investment allocations, their 401(k) contributions and matching contributions were and are invested in the "qualified default investment alternative" that was selected by TTEC.

41.     As of January 1, 2020, the Plan had approximately $200 million in assets under management.

**B.     Defendants Mismanaged the Plan's Recordkeeping Fees Causing Millions of Dollars in Damages to Plan Participants.**

42.     As detailed *infra*, during the Class Period Defendants failed to negotiate market-rate recordkeeping fees with Merrill Lynch and T. Rowe Price; failed to prudently monitor the recordkeeping fees; and failed to prudently benchmark the recordkeeping fees to ensure these fees were appropriate for Plan participants. These breaches of fiduciary duties by Defendants caused millions of dollars in damages to Plan participants.

43.     Administrative services such as recordkeeping, trustee, and custodial services are necessary for the operation of any defined contribution plan and are one of the plan's largest expenses.[9]

44.     "Recordkeeping" in the context of defined contribution plans describes services provided by a plan's primary administrative service provider. "Recordkeepers help plans track the balances of individual accounts, provide regular account statements, and offer informational and accessibility services to participants." *Hughes v. Northwestern University*, 142 S.Ct. 737, 740 (2022).

45.     As reflected in the Plan's participant fee disclosures, the Plan's administrative service providers, Merrill Lynch and T. Rowe Price, performed recordkeeping services that were similar to each other and to the tasks performed by other providers in the marketplace for comparably-sized plans. These services included: processing participant enrollment in the Plan and providing participants with Plan materials; processing and tracking participant contributions and allocating those contributions among Plan investment options; processing and tracking balances and transactions on participants' accounts, including loans, distributions, and withdrawals from the Plan;, generating participant account statements showing contributions, investment allocations, and vested account balances; providing systems for participants to access Plan information, including a web portal and telephone access to a service representative; preparing the Plan's annual Form 5500 statement to the Department of Labor; and furnishing the Plan's fiduciaries with participant and investment information to assist with Plan administration.

---

[9] Consistent with common practice, Plaintiffs use the terms "administrative" and "recordkeeping" fees interchangeably.

46.     To protect retirement plan participants, ERISA requires plan fiduciaries to monitor recordkeeping expenses and ensure that they are reasonable. *See* 29 U.S.C. § 1104(a)(1)(A)(ii) ("[A] fiduciary shall discharge his duties ... solely in the interest of participants ... for the exclusive purpose of[] providing benefits ... and *defraying reasonable expenses of administering the plan*[.]") (emphasis added); *Tibble*, 843 F.3d at 1197 ("cost-conscious management is fundamental to prudence" because "[w]asting beneficiaries' money is imprudent ....") (citations omitted).[10]

**C.      Recordkeeping Costs Are a Function of the Assets under Management and Number of Plan Participants.**

47.     Recordkeepers for large plans, like the Plan here, typically offer a similar basket of services, and variations in the services provided generally do not materially impact the fees charged. Thus, the main determinants of the cost of providing recordkeeping services are the assets under management by a plan and number of participants in a plan.

48.     401(k) plans of a certain size generally have bargaining power to negotiate reasonable fees and expenses for Plan administration and recordkeeping.  As plans grow larger in size, their bargaining power increases.  However, once plans reach a certain size, their bargaining power plateaus, and the marginal ability to negotiate lower prices decreases.

49.     For example, the 401k Averages Book[11] is a commonly used resource guide within the pension industry, which provides comprehensive and accurate data regarding market rate fees.

---

[10] The DOL and SEC have warned that although the fees and costs associated with investment products and services may seem small, over time they can have a significant impact on an investor's portfolio. *See* DOL, *A Look at 401(k) Plan Fees*, at 1-2, *available at* https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (cautioning that 1% difference annually can reduce the investor's account balance at retirement by 28%); SEC Investor Bulletin, *How Fees and Expenses Affect Your Investment Portfolio*, at 1, 3 (2014), *available at* https://www.sec.gov/oiea/investor-alerts-bulletins/ib_fees_expenses.html.

[11] 401k Averages Book, 22nd edition

In this published survey, the average annual per participant cost for recordkeeping and administration fees for a plan with 2,000 participants and $20 million in assets is $25. The average annual per participant cost for recordkeeping and administration fees for a plan with over 2,000 participants and $100 million in assets is $15. The average annual per participant cost for recordkeeping and administration fees for a plan with over 2,000 participants and $200 million in assets is $13. Thus, large plans with $200 million in assets on average pay about half of the amount in recordkeeping and administration fees ($13) that medium-sized plans with $20 million in assets do ($25).

50.     Similarly, plans with larger numbers of participants, like the Plan here, leverage economies of scale by negotiating a lower per-participant recordkeeping fee.

51.     Among larger plans, the market for recordkeeping services is competitive, with many recordkeepers equally capable of providing high-level, comparable services. Accordingly, recordkeepers actively compete to provide recordkeeping services to 401(k) plans for the lowest fees.

52.     Consequently, recordkeeping fees have declined considerably in defined contribution plans since 2000 for two reasons. First, plans have gotten larger and have been able to pass $100 million or $200 million in assets held. Second, plans have gotten larger and the number of plan participants has increased. Between 2006 and 2016, for example, recordkeeping costs decreased by approximately 50% on a per-participant basis and have continued to decline.[12]

---

[12] *See* Greg Iacurci, *Adjusting to the Squeeze of Fee Compression*, Investment News (Nov. 9, 2019) *available at* https://www.investmentnews.com/adjusting-to-the-squeeze-of-fee-compression-170635 ("Median fees for record-keeping, trust and custody services for DC plans fell by about half in the decade through 2017, according to most recent figures published by consulting firm NEPC."); Robert Steyer, *Record-keeping Consolidation Expected to Continue*, Pensions & Investments (Oct. 22, 2020) (noting the continued declines in recordkeeping expenses).

53.     The cost of adding an additional participant to a recordkeeping platform is relatively low. These economies of scale are inherent in all recordkeeping arrangements for defined contribution plans, including the Plan. As a plan's participant count increases, the recordkeeper's fixed costs of providing such services are apportioned to a larger population, thereby reducing the average cost of delivering services on a per-participant basis. This is because large recordkeepers invest in the requisite infrastructure to provide recordkeeping and transaction services to their clients (e.g., a website and call center). These costs also do not materially change with the loss or addition of a new plan. When more participants in a plan are on a recordkeeping platform, the recordkeeper apportions its fixed costs across a larger participant base, thereby reducing the per-participant cost.

54.     Similarly, the average cost to a recordkeeper to service a participant's account does not turn on the account balance. That is, in comparatively similar circumstances, it costs a recordkeeper the same amount to provide services to a participant with an account balance of $1,000 as it does to one with a balance of $100,000.

**D.     Prudent Fiduciaries Regularly Benchmark a Plan's Recordkeeping Fees.**

55.     Prudent fiduciaries will regularly ensure that their plan is paying market-rate fees commensurate with its size in the marketplace to determine whether the plan should negotiate a lower fee with the current recordkeeper or seek a new provider that can provide the services at a lower cost to plan participants. Mercer, one of the world's largest asset managers and a leader in retirement plan consulting, published a report in 2013 that was "based on DOL guidelines, case law, and extensive marketplace experience" and emphasized that prudent fiduciaries should

"benchmark and negotiate recordkeeping and trustee fees at least every other year."[13] This benchmarking is critical in an increasingly competitive environment with declining fees in the marketplace.

56.     Currently, industry experts recommend that their clients continuously review the fees charged by recordkeepers and investment firms to plan participants, and typically conduct Request for Proposal (RFP) bids no less frequently than every two to three years.

57.     Plan fiduciaries who request a price reduction from their incumbent recordkeeper do not receive as low a price relative to soliciting competitive bids because there is an absence of marketplace pressure.

**E.     Defendants Failed to Prudently Monitor, Benchmark, and Negotiate the Plan's Recordkeeping Fees.**

58.     On January 1, 2012, Merrill Lynch became the Plan's recordkeeper.

59.     In 2016, Merrill Lynch collected $59 in fees, including a $51 recordkeeping fee and an $8 "account management fee." As of the end of 2016, the Plan had 17,448 participants with account balances and $122,023,702 in Plan assets.

60.     The Plan continued to grow in 2017, 2018, and 2019. By the end of 2019, the Plan had $176,415,634 in Plan assets.

61.     Despite this continued growth in Plan size—and despite industry practices recommending *continuous* review of recordkeeping and administrative and an RFP bid at least once every two years, Defendants never issued an RFP bid during this four-year period.

---

[13] DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance at 1, 4, *available at* https://www.mercer.com/content/dam/mercer/attachments/global/Retirement/DC%20Fee%20Management%20-%20Mitigating%20Fiduciary%20Risk%20and%20Maximizing%20Plan%20Performance.pdf.

62.     As a result of Defendants failures, Plan participants paid higher-than-market recordkeeping fees during this period, including $51 in 2016, $51 in 2017, $46 in 2018, and $46 in 2019—and a wholly unnecessary additional $8 account management fee each year.

63.     In 2020, T. Rowe Price became the Plan's recordkeeper. With that change, Plan participants finally stopped paying the $8 account management, as T. Rowe Price provided account management services without charging the separate $8 account management fee that Merrill Lynch charged.

64.     Despite replacing their recordkeeper, Defendants shockingly failed to negotiate a lower price for recordkeeping fees. In 2020, Plan participants with an account balance paid a $45 annual recordkeeping fee for the same services provided by Merrill Lynch.

65.     Again, the Plan continued to grow in 2020 and 2021.  By the end of 2021, the Plan had $285,326,100 in assets—approximately 234% more than it did five years earlier in 2016.

66.     Over the same five-year time period from 2016 to 2021, the number of Plan participants with account balances increased approximately 159% from 17,448 to 27,775.

67.      Yet Defendants did not continuously review recordkeeping and administrative fees, nor did they conduct an RFP bid.  As a result, Plan participants continued to pay essentially the same amount in recordkeeping fees, including $45 in 2020, $45 in 2021, and $43 in 2022.

68.     The recordkeeping fees Defendants allowed Merrill Lynch to charge to Plan participants were higher than comparably-sized defined contribution plans during the Class Period employing the same recordkeeping services, showing the Defendants failed to prudently monitor and benchmark these fees, causing the Plan to overpay millions of dollars for recordkeeping services. Before 2016, a prudent fiduciary of a plan with a similar number of participants could have negotiated comparable recordkeeping services of similar or superior quality for an amount

no higher than $30 to $35 per participant. *See infra* ¶ 70.  Indeed, the 401(k) Averages Book reports that the average rate for recordkeeping *and* administrative fees for plans with $100 million in assets was $15.

69.     That a recordkeeper, T. Rowe Price, was willing to charge lower recordkeeping fees in 2020 for comparable services—without a separate $8 account management fee"—demonstrates the Plan fiduciaries caused the Plan to overpay for recordkeeping and administrative fees.

70.     And, as explained *infra*, ¶ 73, when changing recordkeepers from Merrill Lynch to T. Rowe Price, Defendants failed to prudently negotiate the recordkeeping fees, causing the Plan to continue to pay above market-rate for these services.

71.     That Defendants allowed T. Rowe Price to charge Plan participants a $45 annual recordkeeping fee in 2020 reflects a flawed process in evaluating and negotiating, if at all, recordkeeping fees for the Plan. Notably, other plans with the same amount of assets under management and/or the same number of plan participants paid less for recordkeeping fees for the same tasks that Merrill Lynch and T. Rowe Price performed for the Plan. For example, at the end of 2021, the Bricklayers and Trowel Trades International Retirement Savings Plan had 21,600 participants and $239,550,899 in assets, yet its plan participants paid a recordkeeping fee of $25.56 per participant[14], well below the $45 per participant fee charged to Plan participants here for comparable services.[15] Other plans with similar (or fewer) numbers of plan participants also paid

---

[14] The 2021 Form 5500 for the Bricklayers and Trowel Trades International Retirement Savings Plan is available via the U.S. Department of Labor Form 5500 online search tool at https://www.efast.dol.gov/5500search.

[15] While a complete list of the services provided by the recordkeeper for the Bricklayers and Trowel Trades International Retirement Savings Plan is not publicly available, those services included: processing participant enrollment; processing and tracking participant contributions and allocating those contributions among investment options; providing account access via a

less the Plan paid for the same recordkeeping services. *See also*, *e.g.*, *Gordon v. Mass. Mutual Life Ins. Co*, Case No. 13-cv-30184, ECF No. 1, Complaint, ¶ 28, ECF No. 107-2 at ¶ 10.4 (D. Mass. June 15, 2016) (401(k) fee settlement committing a plan with approximately 14,000 participants to pay not more than $35 per participant for recordkeeping services)*; Karla Terraza v. Safeway Inc*., Case No. 16-cv-03994, 2019 WL 1059688, at *3 (N.D. Cal. Mar. 6, 2019) (plaintiffs' expert testified and provided example of a 401(k) plan with 32,000 participants that paid a $35 per participant recordkeeping fee before 2016); *Tracey v. Mass. Inst. of Tech*., Case No. 16-cv-11620, 404 F. Supp. 3d 356, 363 (D. Mass. 2019) (defined contribution plan with approximately 14,000 plan participants paid annual per participant recordkeeping fee of $33 in 2014); *Brotherston v. Putnam Invs., LLC*, Case No. 15-cv-13825-WGY, 2017 WL 1196648, at *3 (D. Mass. Mar. 30, 2017) (finding at summary judgment that a 401(k) with 6,000 participants paid annual per participant recordkeeping fee of $38 in 2008).

### F. Defendants Failed to Prudently Monitor the Plan's Investment Offerings.

72.     In addition to the failure to prudently monitor the Plan's recordkeeping fees, Defendants also engaged in a pattern of imprudent behavior. While the Plan fortunately did not suffer additional losses because of the downturn in 2022 that affected many investment options—imprudent or not—these actions further support a finding that Defendants breached their fiduciary duties.

73.     For example, Defendants allowed T. Rowe Price's proprietary fund—the T. Rowe Price Overseas Stock Fund—to replace a fund that had substantially outperformed the T. Rowe Price fund in the preceding five-year period and has continued to do so. ERISA requires and

---

website and a toll-free telephone number to allow participants to access account information about their accounts and to make changes to their investment choices; and generating and mailing quarterly account statements. *See* https://bacbenefits.org/bac-saveabout-plan401k.

industry experts reinforce that a plan fiduciary cannot incautiously accept a service provider's recommendations when, *inter alia*, determining whether an investment should be included in a plan.[16]

74.     During the Class Period Defendants also failed to ensure that Plan participants were charged appropriate and reasonable fees for the Plan's investment options.

75.     The relationship between an investment's fees—generally in the form of an expense ratio, i.e., the total annual cost to an investor for fund-related expenses—and the effect on retirement account values is well-established. A minor increase in a fund's expense ratio can considerably reduce retirement savings, even more so when the monetary consequence of interest compounding is measured.

76.     On average, there are lower expense ratios for 401(k) participants than those for other investors.[17] ERISA-mandated monitoring of investments requires plan fiduciaries to continually evaluate performance and fees, which results in significant competition among companies offering investment products for 401(k) in the marketplace. The large average account balances of 401(k) plans—especially sizable plans like TTEC's with substantial assets under management and a high number of plan participants—lead to economies of scale and discounted pricing within investment products.

77.     Defendants, for example, from 2016 to 2018 caused an expense ratio of—0.30%—to be imposed on Plan participants for investing in the only equity index fund offered to Plan participants during that period. In a report published in 2018, a leading source of investment

---

[16] *See, e.g.*, *Cunningham v. Cornell*, Case No. 16-cv-6525, ECF No. 226-2, Expert Report, ¶ 29 ("The fiduciary must not blindly rely on the advice of a consultant in carrying out its fiduciary obligations.").

[17] The Brightscope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) plans, 2018, at 51, *available at* https://www.ici.org/system/files/2021-07/21_ppr_dcplan_profile_401k.pdf at 51.

analysis and commentary, Dow Jones & Co., found that investment expenses have continually declined over the years and in *2000*, the average expense ratio for an equity index fund offered to a retail investor with no bargaining power was lower—0.27%—than the expense ratio Defendants imposed on Plan participants from 2016 to 2018.[18]

78.     This fee was outrageous because the average expense ratio of an equity index fund for the Plan's size was 8 basis points (0.08%), or more than three times cheaper than the investment fee Defendants imposed on Plan participants during that period.[19]

| Plan assets | Domestic | International | Target date mutual funds* | Non-target date balanced mutual funds | Domestic | International | Money market mutual funds | Other | Memo: index mutual funds |
|---|---|---|---|---|---|---|---|---|---|
| $1M to $10M | 0.59 | 0.79 | 0.54 | 0.58 | 0.56 | 0.66 | 0.41 | 0.73 | 0.14 |
| >$10M to $50M | 0.51 | 0.69 | 0.47 | 0.48 | 0.47 | 0.58 | 0.34 | 0.70 | 0.11 |
| >$50M to $100M | 0.46 | 0.61 | 0.42 | 0.43 | 0.40 | 0.54 | 0.28 | 0.67 | 0.09 |
| >$100M to $250M | 0.44 | 0.57 | 0.40 | 0.38 | 0.37 | 0.55 | 0.24 | 0.64 | 0.08 |

## VI.   CLASS ACTION ALLEGATIONS

79.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):

> All persons who were participants in or beneficiaries of the Plan, between August 25, 2016 to the present, excluding any persons with responsibility of the Plan's investment or administrative functions (the "Class Period").

80.      The members of the Class are so numerous that joinder of all members is impractical.

---

[18] Investors Might Be Paying Too Much for These Index Funds, *available at* https://www.barrons.com/articles/some-index-funds-charge-higher-fees-51546035074.

[19] Brightscope/ICI Defined Contribution Plan Profile, A Close Look at 401(k) Plans, at 59, *available at* https://www.ici.org/system/files/2021-07/21_ppr_dcplan_profile_401k.pdf.

81.    Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries from Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

82.    There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to: whether Defendants are fiduciaries of the Plan; whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein; whether TTEC failed to adequately monitor the Employee Benefits Committee, and in turn, whether Committee members monitored other fiduciaries to ensure the Plan was being managed in compliance with ERISA; the proper form of equitable and injunctive relief; and the proper measure of monetary relief.

83.    Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in complex class litigation and ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

84.    This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of

separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

## VII.    CAUSES OF ACTION

### COUNT I
### Breaches of Fiduciary Duty of Prudence

85.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

86.    At all relevant times, the Defendants were fiduciaries of the Plan within the meaning of ERISA in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets. 29 U.S.C. § 1002(21)(A).

87.    As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA. 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

88.    Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Defendants: (1) failed to prudently monitor the Plan's recordkeeping fees; (2) failed to regularly benchmark the Plan's recordkeeping fees; and (3) failed to prudently negotiate the Plan's recordkeeping fees; and (4) caused Plan participants to incur excessive investment fees. As a result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had

Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have accumulated more retirement savings.

89.      Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties.

90.      Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

91.      Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendants' own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT II
### Failure to Adequately Monitor Other Fiduciaries

92.      Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

93.      The power to appoint, retain, and remove plan fiduciaries constitutes discretionary authority over the management or administration of a plan within the meaning of ERISA. 29 U.S.C. § 1002(21)(A).

94.      TTEC designated the Employee Benefits Committee to act as the Plan administrator.

95.      Similarly, while it was the Plan sponsor and Plan administrator, TTEC was a fiduciary of the Plan pursuant to 29 U.S.C. § 1002(21)(A). While it was a fiduciary, TTEC had a responsibility to monitor the performance of the Employee Benefits Committee and the Committee

Defendants to ensure that they were complying with the terms of the Plan and ERISA's statutory standards.

96.     The Employee Benefits Committee, as a body of fiduciaries, in turn, is responsible for monitoring the performance of the Committee Defendants. The Committee Defendants were required to monitor the performance of other Employee Benefits Committee members.

97.     A monitoring fiduciary must ensure that fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets, and must take prompt and effective action to protect the plan and participants when the fiduciaries are not meeting their fiduciary obligations.

98.     TTEC and the Employee Benefits Committee breached their fiduciary monitoring duties by failing, *inter alia*, to monitor the Committee Defendants' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein.

99.     Consequently, the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses due to excessive investment fees, recordkeeping fees, and investment underperformance.

100.     Pursuant to 29 U.S.C. §§ 1109(a), 1132(a)(2), and 1132(a)(3), Defendants are liable to restore to the Plan all losses suffered from their failure to properly monitor the Employee Benefits Committee. Defendants are additionally liable for additional equitable relief and other relief as provided by ERISA and applicable law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Elijah Carimbocas, Linda Dlhopolsky, and Morgan Grant, as representatives of the Class defined herein, and on behalf of the Plan, pray for relief as follows:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A declaration that Defendants breached their fiduciary duties under ERISA;

D.    An order compelling TTEC to personally make good to the Plan all losses that the Plan incurred from the breaches of fiduciary duties described herein, and to restore the Plan to the position it would have been in but for this unlawful conduct;

E.    An order granting equitable restitution and other appropriate equitable monetary relief against Defendants;

F.    An order enjoining Defendants from any further violations of ERISA;

G.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate;

H.    An award of pre-judgment interest;

I.    An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and/or the common fund doctrine; and

J.    An award of such other and further relief as the Court deems equitable and just.

Respectfully submitted,

Dated:  May 2, 2023

/s/ *Douglas M. Werman*
One of Plaintiffs' Attorneys

Douglas M. Werman
Maureen A. Salas
**WERMAN SALAS P.C.**
77 W. Washington St., Suite 1402
Chicago, IL 60602
Telephone: (312) 419-1008
dwerman@flsalaw.com
msalas@flsalaw.com

Daniel M. Hutchinson
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: 415.956.1000
dhutchinson@lchb.com

Anne B. Shaver (CO Bar No. 39933)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
1890 Gaylord St.
Denver, CO 80206
Telephone: 415.956.1000
ashaver@lchb.com