IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:22-cv-02188-CNS-STV

ELIJAH CARIMBOCAS,
LINDA DLHOPOLSKY, and
MORGAN GRANT, on behalf of themselves and others similarly situated,

    Plaintiffs,

v.

TTEC SERVICES CORPORATION,
TTEC SERVICES CORPORATION EMPLOYEE BENEFITS COMMITTEE,
EDWARD BALDWIN,
K. TODD BAXTER,
PAUL MILLER,
REGINA PAOLILLO,
EMILY PASTORIUS, and
JOHN AND JANE DOES 1-20,

    Defendants.

---

**OPINION AND ORDER GRANTING MOTION TO DISMISS**

---

This matter is before the Court pursuant to Defendants' (collectively, "TTEC") Motion to Dismiss (ECF No. 44), Plaintiffs' response (ECF No. 46), and TTEC's reply (ECF No. 49). The Court has also considered the parties' subsequent Notices of Supplemental Authority and respective responses (ECF No. 54, No. 55, No. 57, and No. 58).

    **I.    FACTS**

The pertinent facts, drawn from Plaintiffs' First Amended Complaint (ECF No. 39), are set forth in summary here and elaborated upon as necessary in the analysis.

TTEC Services Corporation is a Colorado-based employer with offices throughout the United Sates. It maintains a defined-contribution 401(k) retirement plan ("the Plan" or "the TTEC

1

Plan"), governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), into which employees make periodic contributions. The Plan, in turn, contracts with financial services companies, hereafter referred to as the "trustee," who invest the Plan's assets and provide administrative and account services to the Plan and its participants. From 2012 to 2019, Merrill Lynch was the Plan's trustee, and from 2020 onwards, TTEC contracted with T. Rowe Price to serve as trustee (ECF No. 39, ¶¶ 30–31). The Plan's agreement with trustees authorizes the trustees to collect a fixed annual fee from each plan participant to account for the cost of services provided by the trustee. The fees assessed each year are shown below (*id.*, ¶¶ 59, 62, 67):

| Year(s) | Trustee | Annual Fee (per participant) |
|---|---|---|
| 2016, 2107 | Merrill Lynch | $59[1] |
| 2018 | Merrill Lynch | $54 |
| 2019 | Merrill Lynch | $52 |
| 2020, 2021 | T. Rowe Price | $45 |
| 2022 | T. Rowe Price | $43 |

Plaintiffs contend that TTEC breached its fiduciary duties owed to Plan participants by failing to monitor the annual fees being charged by trustees and by failing to negotiate lower fees consistent with prevailing market rates for plans with similar number of participants and assets.

Plaintiffs also allege that TTEC breached its fiduciary duties owed to Plan participants by offering investment funds that charged participants considerably higher fees than the industry average. Specifically, Plaintiffs point out that from 2016 to 2018, "the only equity index fund offered to Plan participants" carried an expense ratio of 0.30%, but "the average expense ratio of an equity index fund for the Plan's size" during this period was 0.08% (*id.*, ¶¶ 77–78).

Based on these allegations, Plaintiffs assert two causes of action under ERISA, 29 U.S.C. § 1109(a): (i) that TTEC breached its fiduciary duty to Plan participants by failing to monitor and

---

[1] All annual fees charged by Merrill Lynch consist of a base rate that varied over the years, plus a fixed $8 "account management fee" that remained in effect throughout. The figures in the table for Merrill Lynch include the account management fees. T. Rowe Price did not charge a separately identified account management fee.

negotiate appropriate annual fees charged by trustees and by causing Plan participants to incur excessive investment fees; and (ii) that an unspecified Defendant—presumably TTEC Services Corporation itself—breached its fiduciary duties to Plan participants by failing "to monitor the performance of the Employee Benefits Committee" and its members.

## II.     LEGAL STANDARD

Under Rule 12(b)(6), a court may dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted." To survive a motion to dismiss, the plaintiff must allege facts, accepted as true and interpreted in the light most favorable to the plaintiff, to state a claim to relief that is plausible on its face. *See, e.g., Mayfield v. Bethards*, 826 F.3d 1252, 1255 (10th Cir. 2016). A plausible claim is one that allows the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In assessing a claim's plausibility, legal conclusions contained in the complaint are not entitled to the assumption of truth. *See Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011). The pleading standard is a liberal one, however, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (quotation omitted).

## III.     ANALYSIS

Employee benefit plans, including 401(k) plans sponsored by employers, are subject to ERISA's requirement that plan administrators "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries," and "with the care, skill, prudence, and diligence . . . that a prudent [person] acting in a like capacity would use." 29 U.S.C. § 1104(a)(1). Plan administrators have "a continuing duty [] to monitor investments and remove imprudent

ones." *Tibble v. Edison Intern.*, 575 U.S. 523, 530 (2015). The Tenth Circuit has recognized that the fiduciary duties imposed on plan administrators include a duty to avoid "fees associated with the defined-contribution plan [that] are too high compared to available, cheaper options." *Matney v. Barrick Gold of North America*, 80 F.4th 1136, 1148 (10th Cir. 2023).

Plaintiffs' claims can be divided into two general categories: (A) one alleging that TTEC breached its fiduciary duty to plan participants by allowing trustees to charge participants excessive annual fees for administrative and recordkeeping services, and (B) one alleging that TTEC breached its fiduciary duty to plan participants by selecting investment funds that carried excessive management fees in the form of "expense ratios." The Court reviews each category in turn.

### A.    Administrative and Recordkeeping Fee Claims

In *Matney*, a case presenting similar facts to the instant one, the Tenth Circuit acknowledged that it "has yet to consider a plaintiff's pleading burden when the breach of the duty of prudence claim under ERISA arises is the specific context . . . that the [plan's investment committee] acted imprudently by offering higher cost funds and charging higher fees than comparatively cheaper options in the marketplace." 80 F.4th at 1146. After examining several other circuits' approaches to similar claims, the Tenth Circuit adopted the pleading burden articulated by the Eighth Circuit in *Meiners v. Wells Fargo & Company*, 898 F.3d 820, 821 (8th Cir. 2018), particularly its "meaningful benchmark" test. 80 F.4th at 1148. *Meiners* focused on claims like the second category of Plaintiffs' claims here: that the investment funds offered by the plan administrator carried higher fees than comparable plans. But the Tenth Circuit in *Matney* applied that same analysis to the plaintiffs' claims there that the plan's trustees' recordkeeping and other administrative fees were excessive, making *Matney* the controlling analysis here.

4

*Matney* stands for the proposition that, "to raise an inference of imprudence through price disparity, a plaintiff has the burden to allege a 'meaningful benchmark'" to which the defendant's plan can be compared. 80 F.4th at 1148. *Matney* cautions courts that, for a comparison to be "meaningful" in the administrative-cost context, the plaintiff must allege facts showing "that the recordkeeping services rendered by the chosen comparators are similar to the services offered by the plaintiff's plan." *Id.* It contrasted that situation with the situation in *Matousek v. MidAmerican Energy Company*, in which the court rejected the notion that comparison of the defendant's plan to "industry-wide averages," such as the generalized figures published in "the 401K Averages Book," was appropriate. 51 F.4th 274, 279–80 (8th Cir. 2022). Such figures, the court observed, "measure the cost of the typical 'suite of administrative services,' not anything more." *Id.* at 280.

Plaintiffs' Amended Complaint compares the TTEC Plan—a defined-contribution plan that as of 2021, involved approximately 28,000 participants and $286 million in assets (ECF No. 39, ¶ 65)[2]—to the Bricklayers and Trowel Trades' International Retirement Savings Plan ("Bricklayers Plan"), which at the end of 2021 had approximately 21,600 participants and $239 million in assets (*id.*, ¶ 71). The Bricklayers Plan charged participants an annual administrative fee of $25.56 in 2021, whereas T. Rowe Price charged participants in TTEC's Plan a $45 fee that same year (*id.*). In addition to the Bricklayers Plan, Plaintiffs compare the TTEC Plan to plans discussed in certain cases as follows (*id.*, ¶ 71):

- *Gordon v. Mass. Mutual Life Ins. Co.* (D. Mass. 2016). Only a citation to that case's docket is provided. Plaintiffs represent that *Gordon*'s complaint identifies some kind of "settlement" by which a "plan with approximately 14,000 participants" would pay "not more than $35 per participant" for administrative services at some unspecified point in time.

---

[2] The Amended Complaint offers some historical data for the TTEC Plan. In 2016, the Plan had approximately 17,500 participants and approximately $122 million in assets (ECF No. 39, ¶ 59). By 2019, the Plan had approximately $175 million in assets (*id.*, ¶ 60); in 2020 it had approximately $200 million in assets (*id.*, ¶ 41); and by the end of 2021, it had approximately 28,000 participants and $285 million in assets (*id.*, ¶ 65). Plaintiffs do not identify comparable trends for the Bricklayers Plan, offering only a single snapshot of that plan as it existed in 2021.

- *Karla Terraza v. Safeway, Inc.*, 2019 WL 1059688 (N.D. Cal. Mar. 6, 2019). Plaintiffs represent that in that case, the "plaintiff's expert testified and provided example of a 401(k) plan with 32,000 participants that paid a $35 per year participant fee before 2016." This Court notes that *Karla Terraza* involved the court denying a Fed. R. Evid. 702 motion to exclude the expert's opinions about plan fees on the grounds that the expert did not compare the plan to a sufficient number of similarly situated plans, deeming the expert's testimony to be a matter for weighing by the jury. This Court further notes that the two plans being compared in *Karla Terraza* had 32,000 and 37,000 participants and in excess of $1 billion in assets each, *id.* at *3, approximately four times the amount of assets managed by the TTEC Plan in 2021. Nothing in that opinion discusses the services that the plan's trustees provided.

- *Tracey v. Mass. Inst. of Tech.*, 404 F. Supp. 3d 356, 363 (D. Mass. 2019). That opinion involves the denial of the defendant's motion for summary judgment, finding that "the opinions of the parties' experts as to the proper industry protocol and the amount of fees that should be considered reasonable are in stark contrast." *Id.* at 363. Although Plaintiffs' Amended Complaint here represents that the plan in question in *Tracey* involved approximately 14,000 participants, that figure is not recited anywhere within the *Tracey* opinion itself. The *Tracey* opinion makes a passing reference to a "2014 restructuring" of the trustee's fees under the defendant's plan, resulting in an annual fee of $33 per participant, but it provides no other discussion of the plan or the services the trustee provided.

- *Brotherston v. Putnam Inv., LLC*, 2017 WL 1196648 (D. Mass. Mar. 30, 2017), *aff'd in part, vacated and remanded in part*, 907 F.3d 17 (1st Cir. 2018). Although the factual recitation of that case, which was resolved following a modified bench trial, mentions that participants in the plan at issue paid annual fees of $35.84 in 2008, to the best of this Court's reading, the opinion does not address the number of participants nor the amount of assets managed by the plan in question. Nor do the claims in that case appear to challenge the reasonableness of the $35.84 annual fee, as neither that figure nor any comparators are discussed further. In any event, the Court notes that *Brotherston* found that the plaintiffs' claims were not supported by the evidence. *Id.* at *6–7.

The Amended Complaint also cites to the "401(k) Averages Book," asserting that (i) the 22nd edition of that book (publication date unclear), indicates that "the average annual per participant cost for recordkeeping and administration fees for plan with over 2,000 participants and $200 million in assets is $13" (ECF No. 39, ¶ 49); and (ii) during some unspecified time

6

period, "the average rate for recordkeeping and administrative fees for plans with $100 million in assets was $15" (*id.*, ¶ 68).

Taking all the allegations in the Amended Complaint together, the Court finds that Plaintiffs have failed to adequately identify a "meaningful benchmark" against which to compare the TTEC Plan's administrative fees. Working backwards, the Court first finds that Plaintiffs' allegations regarding the 401(k) Averages Book fail to provide any meaningful benchmark. As *Matney* makes clear, the 401(k) Averages Book does not provide the "like-for-like comparison" necessary to plausibly allege an excessive fees claim. 80 F.4th at 1157 (*citing Matousek*, 51 F.4th at 280); *see Matousek*, 51 F.4th at 279–80 ("Rather than point to the fees paid by other specific, comparably sized plans, the plaintiffs rely on industry-wide averages. But the averages are not all-inclusive: they measure the cost of the typical 'suite of administrative services,' not anything more. And using this information creates a mismatch between Merrill Lynch's total compensation, which includes everything it does for MidAmerican's plan, and the industry-wide averages that reflect only basic recordkeeping services.").

Similarly, this Court rejects as comparators the various case citations that Plaintiffs point to, as none of those cases present sufficiently meaningful benchmarks to compare to TTEC's Plan. Putting aside the question of whether pointing to factual allegations discussed in a different case is a sufficient way to plausibly allege the truth of same facts in *this* case, Plaintiffs' references to those cases do not reveal the very information that *Matney* demands to prove the "like-for-like comparison": evidence of "similar plans offering *the same services* for less." 80 F.4th at 1157 (emphasis added). Nothing in Plaintiffs' citations to those cases, much less in the cases themselves, provide enough information for the Court to find that the plans in question in the cited cases are

7

receiving the same administrative services that the Plan here received from Merrill Lynch or T. Rowe Price.

That leaves the question of whether Plaintiffs' allegations concerning the Bricklayers Plan are sufficient to identify it as a "meaningful benchmark" to the TTEC Plan under the standards of *Matney*. This Court finds that the allegations in the Amended Complaint do not rise to that level. As *Matney* indicates, the comparison must turn on allegations showing plans that receive "similar services," yet the comparator plan pays lower administrative fees. Thus, there must be some indication of what services Merrill Lynch or T. Rowe Price provided to the TTEC Plan participants, what services the trustees of the comparator plans provided to those plans' participants, and some reasonable degree of congruence between the two sets of services.[3] The Amended Complaint identifies seven specific services that Merrill Lynch and T. Rowe Price provided to Plan participants here: (1) processing participant enrollment in the Plan and providing participants with Plan materials; (2) processing and tracking participant contributions and allocating those contributions among Plan investment options; (3) processing and tracking balances and transactions on participants' accounts, including loans, distributions, and withdrawals; (4)

---

[3] The question of what constitutes a "reasonable degree of congruence" between two trustees' services can be a difficult one, on which neither *Matney* nor other cases provide particular guidance. Assume two trustees, both of whom provide a website that allows plan participants to engage in online transactions. One, a budget-focused trustee, provides a barebones website with a cumbersome user interface and minimal collateral information (i.e., performance graphs or calculations of a participant's progress towards annual contribution limitations), but charges participants rock-bottom administrative fees. The other, a market-leading investment company, provides participants a state-of-the-art, easily navigated website with abundant performance data and useful financial calculators, but does so at premium annual fees. Is it enough to say that "both trustees provide a website for customer transactions" and proceed to declare them legitimate comparators for purposes of comparing their respective administrative fees? Both trustees may offer a toll-free telephone number for participants to call for information or assistance, but one's call center may be lightly staffed and prone to lengthy delays and inconsistent information while the other's may be universally regarded as prompt and helpful. In a market where financial services companies provide a wide range of customer experiences, a meaningful comparison between two trustees for purposes of evaluating their relative administrative fees may require an assessment of qualitative service issues as well as quantitative ones. Ultimately, however, this Court need not consider that issue in detail, as even a strictly quantitative comparison between the TTEC Plan's trustees' services and those of the Bricklayers Plan reveal sufficient differences to decide this case simply on the face of the Amended Complaint, as set forth herein.

8

generating participant account statements showing contributions, investment allocations, and vested account balances; (5) providing systems for participants to access Plan information, including a web portal and telephone access to a service representative; (6) preparing the Plan's annual Form 5500 statement to the Department of Labor; and (7) furnishing the Plan's fiduciaries with participant and investment information to assist with Plan administration (ECF No. 39, ¶ 45).

By contrast, the Amended Complaint offers a listing of only four services that Plaintiffs speculatively believe the Bricklayers Plan's trustee provides[4]: (a) processing participant enrollment, (b) processing and tracking participant contributions and allocating those contributions among investment options; (c) providing account access via a website and toll-free telephone number; and (d) generating and mailing quarterly account statements (ECF No. 39, ¶ 71 n.15). Without delving into the question of whether Plaintiffs' identification of the trustee services is sufficiently specific to permit meaningful comparison and going strictly by enumeration, it is clear that Merrill Lynch and T. Rowe Price provided more services to the TTEC Plan than the Bricklayers Plan's trustee provided. While there may be congruity on the items listed as (1), (2), (4), and (5) in Plaintiffs' description of the services provided by the TTEC Plan's trustees, there is no indication that the Bricklayers Plan's trustee provided the services identified in items (3) (tracking transactions including loans, distributions, and withdrawals), (6) (providing information

---

[4] Plaintiffs state that "a complete list of the services provided by the recordkeeper for the [Bricklayers Plan] is not publicly available," but they proceed to derive the identification of the four listed services from the Bricklayers Plan's webpage (ECF No. 39, ¶ 71 n.15). It is not clear to the Court how Plaintiffs derived the assertions in the Amended Complaint about the trustee services from the generalized, participant-focused information contained on that webpage. The only portion of the webpage that seems germane to identifying the services the plan's trustee provides reads as follows: "Currently participants are charged on average $27.00 annually for quarterly statement, daily interest access, 800# customer assistance and other recordkeeping services. Additional investment fees are based on the specific funds chosen." *See* BAC Save/About the Plan/401K Home Page, https://bacbenefits.org/bac-saveabout-plan401k (last visited Dec. 4, 2023).

on the Plan's behalf to the Department of Labor), and (7) (providing administrative information to the Plan's fiduciaries).

In their response to the Motion to Dismiss, Plaintiffs argue that the existence of one distinct task not performed by the comparator trustee does not cause the failure of the "meaningful benchmark" requirement, although they cite no authority for that proposition (ECF No. 46 at 13). But cases like *Matousek,* upon which the Tenth Circuit relied in *Matney*, make clear that a plaintiff must "identify similar plans offering *the same services* for less." 51 F.3d at 279 (emphasis added). Although *Matney* ultimately couches its language in slightly less categorical terms, stating that the plaintiff must allege "that the recordkeeping services rendered by the chosen comparators are *similar to the services* offered by the plaintiff's plan," 80 F.4th at 1148 (emphasis added), this Court sees little distinction. What both cases call for is a close congruence between the services provided by the plaintiff's plan and any comparator, and differences in the catalog of services provided by each trustee will quickly dissipate the usefulness of the comparator as a benchmark. Here, in the absence of any additional allegations in the Amended Complaint explaining why the additional services that Merrill Lynch and T. Rowe Price provided to the TTEC plan are *de minimis* or inconsequential in driving the fixing of annual fees charged to participants, the Court must conclude that Plaintiffs' Amended Complaint fails to adequately state a claim.[5]

The Court is not persuaded that boilerplate conclusions recited in the Amended Complaint change this analysis. Plaintiffs state that "[r]ecordkeepers for large plans . . . typically offer a similar basket of services, and variations in the services provided generally do not materially

---

[5] The Court does not, at this time, need to reach or resolve the remaining issues raised by TTEC, including the contention that the Bricklayers Plan is so structurally distinct from the TTEC plan as to render the two incomparable or TTEC's contention that a close examination of the Bricklayers Plan reveals that its annual recordkeeping fees for comparable plan participants are, in actuality, well in excess of the fees charged to the TTEC plan participants. Nor has the Court considered the exhibits attached to TTEC's motion in resolving the issues herein.

impact the fees charged." Instead, Plaintiffs contend that "the main determinants of the cost of providing recordkeeping services are the assets under management by a plan and number of participants" (ECF No. 39, ¶ 47). But that assertion suffers from both factual and legal problems. From a factual standpoint, that assertion is contradicted by Plaintiffs' own allegations listing the disparate services supplied by the TTEC Plan's trustee and the Bricklayers Plan's trustee. For the reasons stated above, it does not appear that both trustees "offer a similar basket of services," nor do Plaintiffs plead facts to support their conclusion that the differences in services being provided "do not materially impact the fees charged" by each trustee. In any event, even if Plaintiffs' assertions in ¶ 47 were otherwise correct, Plaintiffs' suggestion that plan comparisons should be made strictly on the basis of number of participants and amount of assets under management conflicts with *Matney*'s instruction that the focus of any comparison must be on the similarity of services provided by each trustee.

Because Plaintiffs' Amended Complaint does not adequately identify a "meaningful benchmark" comparator offering the same services as the TTEC Plan's trustees at a lower price, Plaintiffs have failed to state a claim for breach of fiduciary duty under ERISA with regard to the administrative and recordkeeping expenses charged to participants. Accordingly, the Court dismisses Plaintiffs' claim that derive from TTEC's alleged failure to "prudently monitor the Plan's recordkeeping fees," to "regularly benchmark the Plan's recordkeeping fees," and to "prudently negotiate the Plan's recordkeeping fees" (ECF No. 39, ¶ 88).

      **B.**    **Expense Ratio Claims**

Plaintiffs also allege that TTEC breached its fiduciary duties to Plan participants by failing to "prudently monitor the Plan's investment offerings." Specifically, Plaintiffs assert a single example: at an unspecified point in time, the TTEC Plan replaced an existing (unnamed) mutual

11

fund investment option with "the T. Rowe Price Overseas Stock Fund," even though the unnamed fund that was replaced "had substantially outperformed the T. Rowe Price fund in the preceding five-year period and has continued to do so" (*id.*, ¶ 73). More generally, Plaintiffs assert that from 2016 to 2018, the "only equity index fund offered to Plan participants" carried an expense ratio (essentially the investment fees charged to participants with assets in that fund) of 0.30% (*id.*, ¶ 77). Plaintiffs contend that during that same period, "the average expense ratio of an equity index fund for the Plan's size" was 0.08% (*id.*, ¶ 78).

Once again, *Matney* requires that claims challenging the fees associated with a plan's investment offerings identify a specific, comparable benchmark against which to measure those fees. "[W]hen it comes to comparing investment management fees," such as expense ratios for a given fund, *Matney* explains that "a meaningful comparison will be supported by facts alleging, for example, the alternative investment options have *similar investment strategies, similar investment objectives, or similar risk profiles to the plan's funds*." 80 F.4th at 1148 (emphasis added). *Matney* makes clear that "a court cannot reasonably draw an inference of imprudence simply from the allegation that a cost disparity exists" between two investment options; "rather the complaint must state facts to show the funds that are being compared are, indeed, comparable." *Id.* at 1149.

Here, the Amended Complaint does not offer any meaningful comparison between the investment objectives, strategies, or risk profiles of the T. Rowe Price Overseas Stock Fund and the unnamed fund it replaced. All that Plaintiffs offer is the fact that the unnamed predecessor fund "outperformed" the T. Rowe Price fund. The simple fact that one fund performed better than another does not suffice to state a claim, as "no authority requires a fiduciary to pick the best performing fund." *Meiners*, 898 F.3d at 823. Without an assertion that both funds shared the same

12

investment objectives and strategies, Plaintiffs cannot establish any breach of fiduciary duty based on the TTEC Plan switching from one to the other. *Id.* ("The fact that one fund with a different investment strategy ultimately performed better does not establish anything about whether the [worse-performing funds] were an imprudent choice at the outset"). Thus, Plaintiffs' allegations concerning the Overseas Stock Fund do not support any claim for breach of fiduciary duty.

Nor does the fact that the TTEC Plan's expense ratio was 0.30% for its equity index fund from 2016 to 2018, compared to an average industry expense ratio of 0.08% for similar index funds, suffice to carry Plaintiffs' pleading burden. Once again, *Matney* addressed this exact issue: there, as here, the plaintiffs attempted to compare their plan's expense ratios with a broad study of mutual fund expense ratios carried out by an entity known as "ICI" (the Investment Company Institute) (*see* ECF No. 39, ¶ 78 n.19 (Plaintiffs citing to an ICI study in support of allegations of average expense ratios)). *Matney* rejected the idea that a broad market study like ICI's provided a meaningful comparator to the expense ratio of a given investment fund, explaining that "a comparison to median expense ratios in broad investment strategy categories, without more, does not provide the meaningful benchmark necessary to satisfy a plaintiff's pleading burden in this context." 80 F.4th at 1155 ("There is no way to compare the large universe of funds—about which we know little—to the risk profiles, return objectives, and management approaches of the funds in [the plaintiffs' plan's] lineup.... [T]he aggregate data fails 'to connect the dots in a way that creates an inference of imprudence." (*quoting Matousek*, 51 F.4th at 282) (citation omitted in original)). For the same reasons explained in *Mantey*, the Court finds that Plaintiffs have failed to allege facts sufficient to support their claim that TTEC breached its fiduciary duties by offering funds with unreasonably large expense ratios.

Because Plaintiffs have not adequately pled any particular breach of fiduciary duty by TTEC with regard to the Plan, the Court further finds that Plaintiffs' claims alleging collateral breaches of fiduciary duty, such as the duty to monitor other Plan fiduciaries, fails as well. Accordingly, the Court grants TTEC's Motion to Dismiss in its entirety and dismisses the Amended Complaint without prejudice.[6]

### IV. CONCLUSION

For the foregoing reasons, the TTEC Defendants' Motion to Dismiss (ECF No. 44) is **GRANTED** and Plaintiffs' Amended Complaint (ECF No. 39) is **DISMISSED WITHOUT PREJUDICE** for failure to state a claim under Fed. R. Civ. P. 12(b)(6). For the reasons set forth in the preceding footnote, if no Motion for Leave to Amend is filed within 14 days of this Order, the Clerk of the Court shall terminate this case.

DATED this 11th day of December 2023.

BY THE COURT:

_____
Charlotte N. Sweeney
United States District Judge

---

[6] Should Plaintiffs seek leave to amend their pleading under Fed. R. Civ. P. 15(a), they may file a motion for such leave within 14 days of this Order and shall attach to that motion a copy of the proposed Second Amended Complaint and a redlined version indicating those instances in which text from the current Amended Complaint has been modified. See D.C.COLO.LCivR 15.1.