**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| ELIJAH CARIMBOCAS, LINDA DLHOPOLSKY, and MORGAN GRANT, on behalf of themselves and others similarly situated,<br><br>    *Plaintiffs*,<br><br>v.<br><br>TTEC SERVICES CORPORATION, TTEC SERVICES CORPORATION EMPLOYEE BENEFITS COMMITTEE, EDWARD BALDWIN, K. TODD BAXTER, PAUL MILLER, REGINA PAOLILLO, EMILY PASTORIUS, JOHN and JANE DOES 1-20,<br><br>    *Defendants*. | Civil Action No.: 1:22-cv-02188-CNS-STV<br><br>Hon. Charlotte N. Sweeney<br><br>Magistrate Judge Scott T. Varholak |

<u>**DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT**</u>

Darren E. Nadel
LITTLER MENDELSON, P.C.
1900 Sixteenth Street, Suite 800
Denver, CO 80202-5835
DNadel@littler.com
Tel: 303.362.2861
Fax: 303.362.8230


*Counsel for Defendants*

Deborah S. Davidson
Matthew A. Russell
Samuel D. Block
MORGAN, LEWIS & BOCKIUS LLP
110 N. Wacker Drive
Chicago, Illinois 60606
Tel.: 312-324-1000
Fax: 312-324-1001
deborah.davidson@morganlewis.com
matthew.russell@morganlewis.com
samuel.block@morganlewis.com

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................................................... 1

RELEVANT FACTS AND ALLEGATIONS................................................................................ 3

    I.      TTEC and the Plan............................................................................................ 3

    II.     Procedural History ........................................................................................... 4

ARGUMENT ............................................................................................................................ 5

    I.      Plaintiffs' Recordkeeping Allegations Do Not Support a Plausible Breach
         (Count I)........................................................................................................... 7

         A.     The 401(k) Averages Book Is Not A Meaningful Benchmark. ................. 7

         B.     Plaintiffs' "Case Law" Is Not A Meaningful Benchmark. ........................ 9

         C.     The Bricklayers Plan is not a Meaningful Benchmark ............................ 12

         D.     TTEC's Frequent Reduction Of Plan Recordkeeping Fees
              Forecloses Any Plausible Inference Of Imprudence. .............................. 18

    II.     Plaintiffs' Derivative Failure-to-Monitor Allegations Fail to State a Claim
         (Count II). ...................................................................................................... 19

CONCLUSION........................................................................................................................ 19

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albert v. Oshkosh Corp.*,
47 F.4th 570 (7th Cir. 2022) ................................................................................14, 19

*Ashcroft v. Iqbal*,
556 U.S. 663 (2009).............................................................................................3, 5

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*,
508 U.S. 602 (1993)...............................................................................................16

*Ditter v. Subaru Corp.*,
2022 WL 889102 (D. Colo. Mar. 25, 2022) ...........................................................11

*Fifth Third Bancorp v. Dudenhoeffer*,
573 U.S. 409 (2014)........................................................................................6, 8, 16

*Gonzalez v. Northwell Health, Inc.*,
2022 WL 4639673 (E.D.N.Y. Sept. 30, 2022) ..........................................................9

*Hughes v. Nw. Univ.*,
142 S. Ct. 737 (2022)....................................................................................6, 18, 19

*Krutchen v. Ricoh USA, Inc.*,
2023 WL 3026705 (E.D. Pa. Apr. 20, 2023) ..........................................................11

*Kurtz v. Vail Corp.*,
511 F. Supp. 3d 1185 (D. Colo. 2021).....................................................................6

*Matney v. Barrick Gold of N.A.*,
2022 WL 1186532 (D. Utah Apr. 21, 2022), *aff'd, Matney v. Barrick Gold of
N. Am.,* 80 F.4th 1136 (10th Cir. 2023) ............................................................ *passim*

*Matousek v. MidAmerican Energy Co.*,
51 F.4th 274 (8th Cir. 2022) .................................................................................7, 8

*Meiners v. Wells Fargo & Co.*,
898 F.3d 820 (8th Cir. 2018) ....................................................................................6

*Nat'l Fair Hous. Alliance v. Brookdale Santa Fe*,
621 F. Supp. 3d 1271 (D.N.M. 2022) ....................................................................11

*Northstar Mgt., Inc. v. Vorel, No.*
    2022 WL 18110173 (W.D. Okla. Nov. 7, 2022) ....................................................................11

*Riley v. Olin Corp.*,
    2023 WL 371872 (E.D. Mo. Jan. 24, 2023) .......................................................................9, 16

*Singh v. Deloitee, LLP*,
    2023 WL 186679 (S.D.N.Y. Jan. 13, 2023) ..........................................................................16

*Smith v. CommonSpirit Health*,
    37 F.4th 1160 (6th Cir. 2022) ...............................................................................................6

*VDARE Found. v. City of Colo. Springs*,
    11 F.4th 1151 (10th Cir. 2021) ..............................................................................................6

**Statutes**

26 U.S.C. § 6058(a) ......................................................................................................................5

29 U.S.C. § 1002(34) ....................................................................................................................3

29 U.S.C. § 1024(a) ......................................................................................................................5

**INTRODUCTION**[1]

This case began almost 18 months ago as a broadside attack on TTEC's 401(k) plan, in a Complaint that speculated various ways that TTEC supposedly breached ERISA's fiduciary duties. ECF No. 1. Rather than respond to TTEC's first motion to dismiss—and after receiving numerous Plan-related documents—Plaintiffs filed an Amended Complaint and narrowed their claims significantly. ECF No. 35. This Court dismissed the Amended Complaint, ECF No. 60 ("Op."), so Plaintiffs have now winnowed their claims even further, alleging only that TTEC violated ERISA by allowing the Plan to pay allegedly "unreasonable" recordkeeping fees. ECF No. 65 (Second Amended Complaint, "SAC").

The Court already rejected this claim once, and the SAC offers no reason to reach a different result. Under the Tenth Circuit's "controlling" analysis in *Matney v. Barrick Gold*, Plaintiffs' prior Amended Complaint failed to allege a "meaningful benchmark" suggesting TTEC breached any fiduciary duty. Op. at 4-7 (quoting *Matney*, 80 F.4th 1136, 1157 (10th Cir. 2023)). Specifically, Plaintiffs did not allege *facts* showing a "reasonable degree of congruence" between the services the Plan received in exchange for its alleged fees, on one hand, and the services any so-called "comparator" plan received, on the other. *Id.* at 8, 10-11. None of the three comparators in the Amended Complaint met this standard based on Plaintiffs' "boilerplate conclusions" that the services were all "similar" to the Plan's. *Id.* Therefore, without well-pleaded allegations showing that "similar plans offer[ed] the same services for less," *id.* at 7, the Court could draw no plausible inference of imprudence from a mere "price disparity"—the sole basis for Plaintiffs' claim, *id.* at 5, 10-11.

---

[1] Terms defined in TTEC's prior Motion to Dismiss (ECF No. 44) have the same meaning here.

Plaintiffs added nothing to the SAC to cure these deficiencies. They do not allege any new facts substantiating the "meaningful benchmark" missing in their last complaint. To the contrary, they doubled down on the *same three* comparators the Court deemed inadequate. And, rather than allege any facts about the services these comparators received, the SAC only adds more boilerplate allegations that their proposed comparators—and apparently *every* large 401(k) plan in America—uses "the exact same" services as the Plan. SAC ¶¶ 5, 50, 59. This does not solve Plaintiffs' problem under *Matney*, which was not a failure to repeat the words "same" or "similar" enough times, but rather the dearth of non-conclusory *facts* to show their comparators use similar services, such that those plans are a "meaningful benchmark" for the Plan. That fundamental flaw remains.

Instead, the SAC rests on the premise that recordkeeping is nothing but a commodity—that *all* providers render "exactly the same" services to *all* 401(k) plans, SAC ¶ 5, not only in scope but also in level and quality. Thus, Plaintiffs continue to insist that price is the only factor that matters in selecting a provider, such that the Court could plausibly infer imprudence from a higher fee alone. But Plaintiffs' theory is contradicted by this Court's ruling, voluminous case law, and Department of Labor ("DOL") guidance. As the Court recognized, recordkeepers differ in many ways, including "qualitative service issues as well as quantitative ones." Op. at 8, n.3. This is why the DOL advises that fiduciaries *should not* evaluate fees in isolation, but rather in relation to the services received in exchange (among other things).[2] Indeed, if all recordkeepers provided the "same" services, there would be no "meaningful benchmark" standard at all. Any plaintiff in any 401(k) plan could allege that some other plan paid less, and that would be enough to subject plan

---

[2] Dep't of Labor, EBSA, Tips for Selecting and Monitoring Service Providers for Your Employee Benefit Plan, https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/tips-for-selecting-and-monitoring-service-providers.pdf.

2

fiduciaries (who are named here as individual defendants) to class-action litigation. But *Iqbal* and *Twombly* require more, as the Tenth Circuit has confirmed. *Matney*, 80 F.4th at 1157-58.

For the reasons below, as well as those set forth in the Court's ruling and TTEC's prior briefing, the SAC does not state a claim and should be dismissed—this time, with prejudice.

**RELEVANT FACTS AND ALLEGATIONS**

### I.      TTEC and the Plan

TTEC is a customer experience technology and services company. SAC ¶ 19. The Plan is one of many benefit programs TTEC voluntarily sponsors for its employees. *Id*. ¶¶ 2, 20. The Plan is an individual-account, defined-contribution plan under ERISA, 29 U.S.C. § 1002(34). The Committee administers the Plan. SAC ¶ 22.

Like all 401(k) plans, there are expenses associated with administering the Plan. These include "recordkeeping" fees for the administrative services necessary for administering the plan. SAC ¶¶ 44-45. These services may include various ministerial tasks, such as "processing and tracking participant contributions." *Id*. However, as Plaintiffs acknowledge, plan recordkeepers also typically offer a wide array of other services, such as call centers and participant websites. *Id.*

TTEC engaged Merrill Lynch as the Plan's recordkeeper in 2012, negotiating its fee as a fixed amount per participant. SAC ¶¶ 58-59. In 2016, TTEC reduced this fee to $59, then reduced it again to $54 in 2018.[3] *Id*. ¶ 62. In 2019, TTEC conducted a request for proposal ("RFP") for recordkeeping services, and effective January 1, 2020, the Plan replaced Merrill Lynch with T.

---

[3] The $59 and $54 recordkeeping-fee numbers include an $8 "account management fee," which TTEC does not concede is part of the recordkeeping fee, but accepts that allegation as true for purposes of the motion to dismiss. *See* Op. at 2, n.1. In any event, the inclusion or exclusion of the "account management fee" has no bearing on whether Plaintiffs pled a meaningful benchmark.

Rowe Price, reducing the fee again to $45.  *Id*. ¶¶ 31, 64.  In 2022, TTEC reduced this fee again, to $43.  *Id*. ¶ 67.

## II.    Procedural History

Plaintiffs filed their initial Complaint on August 25, 2022.  ECF No. 1.  TTEC moved to dismiss, and in response Plaintiffs filed the Amended Complaint.  ECF No. 35.  On May 26, 2023, TTEC filed another motion to dismiss (ECF No. 44), which was fully briefed (ECF Nos. 46, 49).

As relevant to the SAC, the Court dismissed Plaintiffs' claim that TTEC acted imprudently by allowing the Plan to pay more than $30 to $35 per participant for recordkeeping services.  The Court found that pursuant to *Matney*, which "present[ed] similar facts," Plaintiffs "must allege facts showing 'that the recordkeeping services rendered by the chosen comparators are similar to the services offered by the plaintiff's plan.'"  Op. at 5.

The Court then evaluated the three comparators Plaintiffs offered, finding none met the "meaningful benchmark" standard.  First, the Court found, "[a]s *Matney* makes clear, the 401(k) Averages Book [cited in the Amended Complaint] does not provide the 'like-for-like comparison' necessary to plausibly allege an excessive fees claim."  Op. at 7.  Second, the Court rejected Plaintiffs' string cite to four other ERISA lawsuits, as none discussed the services those plans used—"the very information that *Matney* demands" to state a viable claim.  *Id*.  Third, the Court held that "going strictly by enumeration" (and even putting aside differences in quality or level of service), Plaintiffs' comparison to a single other plan—the Bricklayers Plan—was inadequate because the Plan's recordkeeper provided "more services."  *Id.* at 9.  The Court was "not persuaded that boilerplate conclusions" that all large plans "typically offer a similar basket of services" is enough to "plead facts" that two distinct plans offered similar services.  *Id*.

4

The Court afforded Plaintiffs an opportunity to amend their complaint again.  Op. at 14. On December 22, 2023, the Court granted Plaintiffs' motion for leave to amend. ECF Nos. 61, 62.

The SAC removed Plaintiffs' prior challenge to certain Plan investment options, retaining only their recordkeeping-fee claim.  Citing the same three comparators as before, the SAC merely added conclusory allegations that *every* plan at issue within those comparators received the "same seven recordkeeping services" as the Plan.  SAC at ¶¶ 50, 59, 73.  Plaintiffs support this new allegation by stating (without citation) that "these recordkeeping services are required by ERISA" and are utilized by *any* plan that completes a Form 5500, an annual report required for nearly *all* 401(k) plans.[4]  *Id.* at 5.  The SAC further alleges that "many of the administrative recordkeeping duties for ERISA plans of the same size and scope are exactly the same."  *Id*. at ¶¶ 5, 50, 59, n.16. Otherwise, Plaintiffs' allegations are materially the same.  *See* ECF No. 61-2 (SAC redline).

## ARGUMENT

To avoid dismissal, Plaintiffs must plead "sufficient factual matter" to "state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 663, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  While "[t]he nature and specificity of the allegations required to state a plausible claim will vary based on context," the Court "need not accept conclusory allegations without supporting factual averments."

---

[4] *See* 29 U.S.C. § 1024(a) (requiring administrator of any employee benefit plan subject to ERISA to file an annual report); 26 U.S.C. § 6058(a) (Internal Revenue Code section requiring employers that maintain a qualified pension plan to file an annual report); *see generally* Employee Benefits Security Admin., *Form 5500 Series* (providing links to the Form 5500 and instructions), https://www.dol.gov/agencies/ebsa/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500.

*VDARE Found. v. City of Colo. Springs*, 11 F.4th 1151, 1159 (10th Cir. 2021) (citations omitted).

In the ERISA context, motions to dismiss are an "important mechanism for weeding out meritless claims." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). This is because "the circumstances facing [fiduciaries] will implicate difficult tradeoffs, and courts must give due regard"—even at the pleadings stage—"to the range of reasonable judgments a fiduciary may make." *Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022). A fiduciary breach claim "therefore focus[es] on the process the fiduciary uses rather than the outcome." *See, e.g.*, *Kurtz v. Vail Corp.*, 511 F. Supp. 3d 1185, 1196-97 (D. Colo. 2021). While a plaintiff may lack some details about a fiduciary's decision-making process, they "have extensive information" about plan fees "because of ERISA's disclosure requirements." *Meiners v. Wells Fargo & Co.,* 898 F.3d 820, 822 (8th Cir. 2018); *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1168 (6th Cir. 2022) (discussing the central role such disclosures and "publicly available [] information" play in allowing a plaintiff to "plead[] a process-based" fiduciary-breach claim under ERISA).

Here, the SAC offers no direct allegations about flaws in TTEC's fiduciary process for overseeing the Plan's administrative fees (although it concedes the Committee reduced those fees four times over a six-year period, conducted an RFP, and changed services providers). *Supra* at 3-4. Instead, Plaintiffs ask the Court to *infer* an imprudent process based solely on allegations that the Plan's recordkeeping costs were higher than a few hand-chosen comparators. Therefore, to "raise an inference of imprudence through price disparity," Plaintiffs have "the burden to allege a 'meaningful benchmark' to which the defendant's plan can be compared." Op. at 5 (citing *Matney*, 80 F.4th at 1148). This requires pleading facts—not conclusions—showing a "reasonable degree of congruence" between the services received by the challenged and the comparator plans. *Id*. at

6

8.   As the Court noted, moreover, a meaningful benchmark "may require an assessment of qualitative service issues as well as quantitative ones."  *Id*. at 8, n.3.

## I.   Plaintiffs' Recordkeeping Allegations Do Not Support a Plausible Breach (Count I).

Plaintiffs attempt to create an inference of imprudence based on allegations nearly identical to those the Court already rejected.  For the same reasons the Court has identified—and more—Plaintiffs' allegations fail to satisfy the Tenth Circuit's "meaningful benchmark" standard.

### A.   The 401(k) Averages Book Is Not A Meaningful Benchmark.

As before, Plaintiffs cite the 401(k) Averages Book for the proposition that plans with more than 2,000 participants and $200 million in assets pay an average of $13 per participant for recordkeeping services.  SAC ¶¶ 6, 49.  This Court, following the Tenth Circuit *Matney*, has already held that "the 401(k) Averages Book does not provide the 'like-for-like comparison' necessary to plausibly allege an excessive fees claim."  Op. at 7 (quoting *Matney*, 80 F.4th at 1157).  This "resource guide" (SAC ¶ 6) provides only "industry-wide averages" that "are not all-inclusive: they measure the cost of the typical 'suite of administrative services,' not anything more."  *Id.* (citing *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 280 (8th Cir. 2022)).

Plaintiffs' only attempt to cure this pleading deficiency was to tack on one new paragraph, concluding without citation that "each of the plans listed in the 401k Averages Book provides the *exact same seven services* . . . that Merrill Lynch and T. Rowe Price provided for the Plan."  SAC ¶ 50 (emphasis added).  There are at least three problems with this allegation.

*First*, as *Matousek* made clear, the 401(k) Averages Book measures "industry-wide averages," but not what *services* "each of the plans listed" in fact received.  51 F.4th at 280.  Indeed, the 401(k) Averages Book does not disclose which plans it includes in its underlying data,

7

underscoring why Plaintiffs' allegation that "each of the plans listed" used "the exact same" services is wholly conclusory and speculative. *See* Ex. A (Excerpt from 401k Averages Book) ("We do not release the names of the providers or products in the *401k Averages Book*").[5] As in *Matney*, the Court does "not have to take as true this mere conclusory statement" that unidentified plans in the 401(k) Averages Book used the "exact same" services as the Plan. 80 F.4th at 1158.

*Second*, even if the 401(k) Averages Book listed the plans being surveyed and the services they received, it still is not a meaningful benchmark in light of Plaintiffs' other allegations. The SAC alleges that "many of the administrative recordkeeping duties for ERISA plans *of the same size and scope* are exactly the same." SAC ¶ 5 (emphasis added). And yet Plaintiffs compare the Plan—which ranged from 17,500 to 28,000 participants, *id.* ¶ 66—to the 401(k) Averages Book's survey of plans with around 2,000 participants. *Id*. ¶ 6; Op. at 5. The 401(k) Averages Book is not a meaningful benchmark for this additional reason, as it includes plans that are not even close to the same size as the Plan. *Cf. Matney*, 80 F.4th at 1149 ("[W]e cannot infer imprudence unless similarly sized plans spend less on the same services.") (citing *Matousek*, 51 F.4th at 279).

*Third*, the 401(k) Averages Book does not "account[] for any indirect payments," which is how many plans—such as the 401(k) component of the Bricklayers Plan, *see infra* at 17—pay for recordkeeping costs. *See Gonzalez v. Northwell Health, Inc.*, 2022 WL 4639673, at *10 (E.D.N.Y. Sept. 30, 2022) (finding the 401k Averages Book "provides little insight" into a reasonable fee for

---

[5] Plaintiffs did not address the Court's observation that the citation to the 22nd Edition of the 401(k) Averages Book was for "some unspecified time period," making it unclear if the allegation has any relevance to what the Plan paid for recordkeeping during the challenged time period. Op. at 6-7. TTEC was unable to find any copy of the 22nd Edition, so Exhibit A is an excerpt from the 23rd Edition. TTEC further notes that the 21st Edition of the 401(k) Averages Book includes the same excerpted language quoted above. *See* Ex. B (Excerpt from 21st Edition).

the challenged plan).  TTEC's Plan does *not* use indirect payments to pay for recordkeeping, making the $13 in "direct" fees listed in the 401(k) Averages Book a classic apples-to-oranges comparison because this $13 average does not capture all recordkeeping fees.  *See* SAC ¶¶ 59, 62.

### B.    Plaintiffs' "Case Law" Is Not A Meaningful Benchmark.

The "case law" Plaintiffs cite, like the 401(k) Averages Book, is essentially unchanged from the allegations this Court already rejected.  Op. at 7.[6]  The SAC cites the same four cases that purportedly reflect what other plans paid for unidentified services in a single year.  SAC ¶ 73.  As before, "Plaintiffs' references to those cases do not reveal the very information that *Matney* demands to prove the 'like-for-like comparison'" required to state a viable claim.  Op. at 7.  That is because "[n]othing in Plaintiffs' citations to those cases, much less in the cases themselves, provide enough information for the Court to find that the plans in question in the cited cases are receiving the same administrative services that the Plan here received."  *Id*.  Plaintiffs' reference to "case law" still does not raise any plausible inference of a fiduciary breach for the same reasons the Court held previously, as well as one additional reason to which the Court alluded.

*First*, Plaintiffs did not provide the information the Court held was missing.  They allege no new facts about the administrative services received by *any* of the plans at issue in their cited "case law."  Instead, they only added a sentence stating that "each of these plans submitted Form

---

[6] Numerous other courts also have rejected similar attempts to cite alleged recordkeeping fees at issue in other cases.  *See, e.g.*, *Matney,* No. 2:20-cv-00275, ECF No. 2, ¶ 118 n.13 (complaint using *Gordon v. Mass Mutual* and three other cases as recordkeeping fee benchmarks); *Matney v. Barrick Gold of N.A.*, 2022 WL 1186532, at *12 (D. Utah Apr. 21, 2022) (finding one of the same "case law" comparators—*Gordon v. Mass Mutual*—was not a meaningful benchmark), *aff'd, Matney v. Barrick Gold of N. Am.,* 80 F.4th 1136 (10th Cir. 2023); *Riley v. Olin Corp.*, 2023 WL 371872, at *3 (E.D. Mo. Jan. 24, 2023) (plaintiffs' "reliance on expert opinions proffered by plaintiffs in other cases, an unspecified declaration, and the terms of a settlement agreement reached in another unrelated case did not provide a meaningful benchmark").

5500s to the Department of Labor confirming that a plan recordkeeper necessarily performed each of the same seven recordkeeping services." SAC ¶ 73. This does nothing to advance Plaintiffs' claims. To start, the Court need not accept such a conclusory assertion. *Supra* at 5-6. This new sentence is not a well-pleaded *fact* that would substantiate or shed any light on what services the other plans actually used. As the Court already observed, there is nothing in the cases Plaintiffs cite that reflects whether the comparator plans received similar services to the Plan. Op. at 7.

Regardless, the mere filing of a Form 5500 does not alter that conclusion. A Form 5500 is simply an annual report that almost every 401(k) plan must file with the DOL and Internal Revenue Service. *Supra* at 5, n.4. It requires that a plan report certain information as of the start and end of each year, such as its number of participants, assets, service providers, and investments, among other things. *See, e.g.*, Ex. C (TTEC 2020 Form 5500). A Form 5500 does not enumerate the specific administrative services a plan chooses to utilize, such as whether its recordkeeper maintains a "web portal and telephone access to a service representative," or myriad other optional services a provider might offer. SAC ¶ 45. And the Form 5500 certainly provides no information about the scope, level, or quality of services a recordkeeper renders to any given plan. In any event, Plaintiffs did not even cite or attach the Form 5500 for any plan in their cited "case law."

What Plaintiffs appear to be saying is that *any* 401(k) plan that files a Form 5500—which, again, is nearly all of them—requires a baseline set of administrative services, and this array is limited *only* to the seven services the SAC lists. This allegation is implausible on its face. To the extent Plaintiffs aver that these are the *only* services a recordkeepers provides, then this is a purely conclusory allegation the Court need not accept. *Supra* at 5-6. To the extent Plaintiffs contend that every plan that engages a recordkeeper will use *at least* these seven basic services, then such

an allegation is immaterial, as it says nothing about any additional or optional services a particular plan selects (much less anything about the level or quality of those services).  Either way, Plaintiffs' new allegations defy common sense and mischaracterize recordkeeping services as a commodity, contradicting both (1) *Matney*'s demand for "reasonable congruence" between the services being compared, and (2) longstanding DOL guidance that fiduciaries *should not* assess fees in isolation, but rather relative to the scope and quality of services their plans receive.  *Supra* at 2; *see also Krutchten v. Ricoh USA, Inc.*, 2023 WL 3026705, at *2 (E.D. Pa. Apr. 20, 2023), appeal docketed, No. 23-1928 (3d Cir. May 23, 2023)  (noting "fiduciaries may reasonably choose to pay more for higher quality services," and dismissing similar claims based on the same conclusory allegations that "it is categorically imprudent to charge participants higher fees because all recordkeepers provide the same quality of services") (quotations omitted).

*Second*, as the Court alluded to (Op. at 7), Plaintiffs' "case law" also does not sustain a plausible claim because "[f]actual findings in one case ordinarily are not admissible for their truth in another case." *Nat'l Fair Hous. Alliance v. Brookdale Santa Fe*, 621 F. Supp. 3d 1271, 1280 (D.N.M. 2022); *see also Northstar Mgt., Inc. v. Vorel, No.* 2022 WL 18110173, at *7 (W.D. Okla. Nov. 7, 2022) ("[I]t is improper for the Court to take judicial notice of factual findings of admissions made in another case."); *Ditter v. Subaru Corp.*, 2022 WL 889102 at *5 (D. Colo. Mar. 25, 2022) (refusing to "recognize" findings of fact and judicial admissions from other cases) (citations omitted).  Here, Plaintiffs have merely "point[ed] to factual allegations discussed in a different case," which is not a "sufficient way to plausibly allege the truth of [the] same facts in *this* case." Op. at 7.  Nothing in the SAC changes this conclusion.

### C.        The Bricklayers Plan is not a Meaningful Benchmark.

Finally, Plaintiffs again cite the fees that just one random plan, the Bricklayers Plan, allegedly paid for recordkeeping services in one single year (2021). SAC ¶ 59.[7] The Court already rejected the Bricklayers Plan as a "meaningful benchmark" for the Plan, and the SAC alleges no facts to change that conclusion. Despite admitting that "a complete list of the services provided by the recordkeeper the Bricklayers [Plan] is not publicly available" (*id*. ¶ 59, n.15), Plaintiffs rely on "generalized, participant-focused information" on a webpage to allege that the Bricklayers Plan received the same services as the Plan. Op. at 9, n.4. The Court previously dismissed this allegation because Plaintiffs listed four services the Bricklayers Plan received, as compared to seven for the Plan. *Id*. at 9-10. Striving to cure this flaw, the SAC—relying on the *same* webpage that the Court found was "not clear" (*id*. at 9)—now alleges the Bricklayers Plan received "the exact same" seven services as the Plan. SAC ¶ 59. This unsupported, conclusory amendment does not alter the result: the Bricklayer's Plan is not a sufficient benchmark for several reasons.

*First*, "going strictly by enumeration," Op. at 9, Plaintiffs still do not plausibly allege that the Bricklayers Plan received the same recordkeeping services as the Plan. To identify the services the Plan supposedly received, Plaintiffs rely on "the Plan's participant fee disclosures." SAC ¶ 45. But these fee disclosures show that the Plan's chosen services went beyond the seven services the SAC lists—including, for example, "providing participants . . . educational materials related to savings and investing for retirement." Ex. D at 3.[8] The disclosure goes on to say:

---

[7] The cited paragraph is numbered as 59, but it appears between paragraphs 72 and 73 (at pg. 18).

[8] The Court may consider, at the pleading stage, "documents that the complaint incorporates by reference[.]" *Matney*, 80 F.4th at 1151 n.11 (finding district court properly considered documents referenced in the complaint, including fee disclosures, Forms 5500, and the 401k Averages Book).

**Learn more**

To learn more about investing, visit Benefits OnLine at www.benefits.ml.com.  Then select the Education and Planning tab. Here you can view a wealth of informative articles and videos intended to help you feel confident in your financial future at each stage of your life, whether you are just starting out, transitioning to retirement or somewhere in between.

Our Risk Assessment and Investment Guide, available via the Investment Direction section of your Investments, is a guide that can help you understand your risk profile and how you might invest in your accounts.

Plaintiffs do not allege that the Bricklayers Plan's recordkeeper provided any educational materials, such as a "wealth of informative articles and videos" to help participants plan for retirement or a "Risk Assessment and Investment Guide."  *Id.*  While Plaintiffs now allege that "at all relevant times, the Plan has never offered any additional recordkeeping services not provided by the comparator plans" (SAC ¶ 74), factual allegations "that contradict . . . a properly considered document are not well-pleaded facts that the court must accept as true."  *Matney*, 80 F.4th at 1145 (rejecting allegations that the comparator and plan's recordkeeping services were "ministerial in nature," where document incorporated by reference "contradicted" such allegations).  It also remains unclear "how Plaintiffs derived the assertions" that the Bricklayers Plan provides "the exact same" services Plaintiffs identify.  Op. at 9, n.4.  As it did before, the Court can reject the Bricklayers Plan as a meaningful benchmark "strictly by enumeration" because Plaintiffs have not plausibly alleged that plan received the same services as the Plan.

*Second*, even if Plaintiffs had plausibly alleged the same *number* of services, the SAC's broad, generic descriptions of those categories do not shed any light on the Plan's services by comparison.  As the Court correctly observed, there is a separate question as to whether "Plaintiffs' identification of the trustee services is sufficiently specific to permit meaningful comparison," which "may require an assessment of qualitative service issues as well as quantitative ones."  Op. at 8-9, n.3; *see Albert v. Oshkosh Corp.*, 47 F.4th 570, 579 (7th Cir. 2022) (plaintiffs must account

13

for "the quality or type of recordkeeping services the comparator plans provided"); *Matney*, 2022 WL 1186532, at *13 (dismissing recordkeeping-fee claims based on "generalizations, assumptions, and unsuitable comparisons"). As alleged, Plaintiffs merely identified seven generic categories of service in their broadest sense. And they used the *very same* sources upon which the prior Amended Complaint relied, yet they now allege the Bricklayers Plan received seven services (as opposed to four), arguing these "are required by ERISA and/or specified in the plan document." SAC ¶ 59.[9] Although unclear, it appears Plaintiffs are asserting that because the Bricklayers Plan filed a Form 5500, then it necessarily must have received the same seven—and *only* these seven— recordkeeping services. *Id*. n.16 (alleging that "the Bricklayers plan *could not have submitted the recordkeeping data in the Form 5500 without a recordkeeper to perform each of these [seven] recordkeeper services*") (emphasis in original).

As discussed (at 10-11), the suggestion that all plans that file a Form 5500 always utilize the same recordkeeping services is contrary to law and fact, and it is a conclusory allegation that all providers are interchangeable and that all services are a commodity. As Plaintiffs concede, "the market for recordkeeping services is competitive," and recordkeepers differentiate themselves by offering distinct services, quality, and prices. SAC ¶ 52. Just as it would be implausible to allege that cars made by Ferrari, Kia, Tesla, and Toyota are "the exact same"—because all have wheels, engines, and seats—it is equally implausible to allege that all recordkeepers provide the

---

[9] Despite this sentence, Plaintiffs do not cite the Bricklayer Plan's governing document, which is not publicly available. So Plaintiffs are alleging either that (1) ERISA requires these services (which is untrue, as ERISA does not require any specific administrative services, much less items such as a call center, website, or educational materials); or (2) these services are set forth in a document they presumably do not have. This is another reason the Court need not accept the conclusory allegation that the Bricklayers Plan received the seven services Plaintiffs allege.

14

same services at identical quality to every plan simply because they provide "systems for participants to access Plan information," offer websites, and have call centers.  SAC ¶¶ 45, 54.  Indeed, Plaintiffs' own allegations show that recordkeeping is not a commodity:  instead of clustering around a single price point, their proposed comparators (which supposedly offer "the exact same" services) paid fees ranging from $13-$25 to $30–$35, nearly doubling or tripling in price.  SAC ¶¶ 6, 49, 68, 73.  This would make no sense under Plaintiffs' reasoning.

Indeed, the Court has already highlighted two clear examples of this point:  a plan website and a participant call center.  Op. at 8, n.3.  Merely alleging that both the Plan and the Bricklayers Plan engaged a recordkeeper that provided a website and call center, even if true, says nothing about whether those services are sufficiently "similar," so that the Court could draw any plausible inference about the prudence of a fiduciary's decision to pay the higher price.  As the Court noted, there can be "budget-focused" providers with a "barebones website," and more expensive providers with a "state-of-the-art, easily navigated website with abundant performance data and useful financial calculators."  Op. at 8, n.3.  Indeed, even the participant disclosures upon which Plaintiffs rely suggest the Plan had a website more like the latter.  *Supra* at 12-13.  And, of course, not all call centers are created equal; to argue otherwise in a lawsuit against TTEC, a nearly $1 billion company in the business of call center technology, would be no small irony.  *Id*.

To be clear, the Court does not need to resolve, as a factual matter, whether the Plan's website or call center was "better" than the Bricklayers Plan's website or call center.  Nor does it need to determine what level of specificity some other plaintiff must allege to establish a "reasonable degree of congruence" between such services.  All the SAC offers in *this* case is a generic allegation that all recordkeeping services are the same—an allegation that could be made

15

in *every* case like this one.  Such allegations are plainly insufficient to establish a "meaningful benchmark" here.  *Riley*, 2023 WL 371872, at *3 (the "conclusory argument that 'recordkeepers in the marketplace offer the same range of services' fails to allege what specific services any of the plans provide"); *Singh v. Deloitee, LLP*, 2023 WL 186679, at *5 (S.D.N.Y. Jan. 13, 2023) (rejecting similar allegations).

*Third,* the Plan and the Bricklayers Plan are "so structurally distinct" as to be incomparable, an argument the Court recognized but did not address.  Op. at 10, n.5.  As TTEC's prior motion to dismiss explained (ECF No. 44, at 8), the Bricklayers Plan is a multi-employer, collectively-bargained plan sponsored by a $1.8 billion pension fund.[10]  Ex. E at 21-22, 27 (Bricklayers Plan, 2021 Form 5500); Ex. F at 2 (Bricklayers & Trowel Trades Int'l Pension Fund, 2021 Form 5500). It also shares "administrative" costs with another defined-benefit pension plan and consists of two "components," the much larger of which is employer-directed (i.e., participants do not choose among investment options, meaning there is less recordkeeping work involved).  *Id*.  TTEC's Plan does not have the same (or even similar) economies of scale or cost-sharing, nor the simplicity of being employer-directed.  And the public disclosure on which Plaintiffs rely makes clear that the Bricklayers Plan's recordkeeper *is not* providing the "same services" as the Plan, because it receives such services from multiple sources, whereas the Plan only used one provider.  Ex. G at 27 ("The Bricklayers and Trowel Trades International Pension Plan (United States Plan) *provides various administrative services to the [Bricklayers] Plan, including the processing of*

---

[10] A multi-employer pension plan is a retirement plan to which more than one employer contributes through an agreement with a union. *See Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 605 (1993).  "The contributions made by employers participating in such a multiemployer plan are pooled in a general fund available to pay any benefit obligation of the plan." *Id*.

*contributions to the Plan*.") (emphasis added). In other words, the Bricklayers Plan is receiving "various administrative services" from multiple sources, whereas TTEC is only receiving those services from its recordkeeper. ECF No. 65, ¶ 43, n.9 (alleging the terms "administrative and recordkeeping" are "interchangeabl[e]"). This makes clear that Plaintiffs do not offer an apples-to-apples comparison of these two plans' service arrangements or fees.

*Fourth*, TTEC previously explained why "a close examination of the Bricklayers Plan reveals that its annual recordkeeping fees for comparable plan participants are, in actuality, well in excess of the fees charged to the TTEC plan participants," an argument the Court recognized but did not resolve. Op. at 10, n.5; ECF No. 44, at 9. The "401(k) Component" of the Bricklayers Plan—which, like TTEC's Plan, is participant-directed and offers an array of investment options—charges participants 70 bps (0.70%) to cover recordkeeping services, which equates to $117.52 per participant, far more than the Plan's alleged fee.[11] So even if the Court were interested in a purely price-tag-to-price-tag comparison, Plaintiffs do not meet *Matney*'s requirement of plausibly alleging that "the comparator plan pays lower administrative fees." Op. at 8.

For all of these reasons, or any one of them independently, Plaintiffs still have not alleged sufficient facts to establish that the Bricklayers Plan is a "meaningful benchmark" under *Matney*.

---

[11] *See* Ex. H at 1 (Bricklayers 401(k) Plan Fund Change Notice (stating the 401(k) component has a "70 basis points recordkeeping fee"); Ex. I at 16-19 (401(k) Plan Information) (the "Contractors who are incorporated…" link included in Plaintiffs' "About the Plan" citation (SAC ¶ 59, n.15) also shows the recordkeeping fee—i.e., "Standard Asset Fees"—is 70 basis points)); Ex. G at 1 (Bricklayers 401(k) Plan June 2022 Status Report) (the 401(k) component has $4.6 million in assets and 274 participants). This means there is a 70 bps fee on $4.6 million in assets ($4,600,000 * 0.70% = $32,200) that is paid by 274 participants, resulting in a recordkeeping fee of $117.52 per participant ($32,200 / 274 = $117.52).

> **D.    TTEC's Frequent Reduction Of Plan Recordkeeping Fees Forecloses Any Plausible Inference Of Imprudence.**

Although the Court's prior ruling focused on *Matney*'s "meaningful benchmark" pleading requirement, there are several other independent reasons to dismiss Plaintiffs' SAC.  Most notably, the undisputed fact that TTEC reduced the Plan's recordkeeping fees four times over a six-year period, conducted an RFP, and changed service providers—all of which are alleged in the SAC, *supra* at 3-4—precludes any plausible inference that TTEC's actions in overseeing and negotiating recordkeeping fees were imprudent under ERISA.

As TTEC explained, a claim for fiduciary breach focuses on the reasonableness of a fiduciary's *conduct*, not the results of its decision-making process in hindsight.  *See* ECF No. 44, at 1.  So the question is not whether a few other plans may have obtained a lower fee, but whether TTEC acted prudently in monitoring and negotiating the Plan's costs.  In evaluating a motion to dismiss, therefore, the Court must perform a "context-specific inquiry" that accounts for all circumstances relevant to Plaintiffs' alleged breach.  *Hughes*, 142 S. Ct. at 742.  And when, as here, a plaintiff seeks an inference of imprudence based on a disparity in recordkeeping fees, allegations about periodic changes to those fees—or a lack thereof—are part of the context a court should consider.  For example, in *Matney*, "a case presenting similar facts" (Op. at 4), plaintiffs alleged that defendants reduced recordkeeping fees from $101 in 2014, to $85 in 2015, to $68 in 2017, and to $53 in 2020.  80 F.4th 1136 at 1156.  The Tenth Circuit found that allegations showing "the Plan's recordkeeping fees became cheaper over time" contradicted any "reasonable inference that the Committee violated its fiduciary duty."  *Id.* (finding such a claim implausible "where the allegations show the Committee regularly re-negotiated their fee arrangement with [the recordkeeper], resulting in lower costs for participants").

Here, TTEC reduced the Plan's fees the same number of times over the same number of years—and it even started from a much *lower* fee.  ECF No. 65, ¶¶ 62, 67 (alleging TTEC reduced recordkeeping costs from $59 in 2016, to $54 in 2018, to $45 in 2020, and to $43 in 2022).  Moreover, though "nothing in ERISA requires a fiduciary to obtain competitive bids at any regular interval,"[12] Plaintiffs concede TTEC did conduct an RFP that resulted in a change in recordkeepers and further fee reductions.  SAC ¶¶ 59-61.[13]  As in *Matney*, no inference is needed in TTEC's favor to find that Plaintiffs' own allegations of frequent fee reductions foreclose the inference that it is *their burden* to create—*i.e.*, that TTEC imprudently monitored Plan recordkeeping fees.

## II.     Plaintiffs' Derivative Failure-to-Monitor Allegations Fail to State a Claim (Count II).

In Count II, Plaintiffs allege that TTEC and the Committee breached their separate duty to monitor other Plan fiduciaries.  SAC ¶¶ 93-101.  This duty-to-monitor claim hinges entirely on the Plaintiffs' underlying prudence claim (Count I).  Because Count I fails for the reasons above, the derivative monitoring claims fail as well.  *See, e.g.*, Op. at 14; *Matney*, 80 F.4th at 1158 (affirming dismissal of "derivative" duty to monitor claim).

**CONCLUSION**

Having now filed three different complaints, it is clear that Plaintiffs cannot plead around the fundamental deficiencies that foreclose their claims under ERISA.  For the foregoing reasons,

---

[12] *Matney*, 2022 WL 1186532, at *12 (collecting cases); *see also Albert*, 47 F.4th at 579 (noting the Supreme Court in *Hughes* "did not hold that fiduciaries are required to regularly solicit bids from service providers").

[13] Plaintiffs offer no support for the statement that fiduciaries must conduct an RFP "at least once every two years," and their allegation that "Defendants never issued an RFP during this four-year period" of 2016-2019 is contradicted by their admission that the Plan switched recordkeepers on January 1, 2020, immediately after an RFP.  SAC ¶¶ 31, 59-61.  An RFP is not a process that can be completed in a day; Plaintiffs' allegations make clear that an RFP was issued before 2020.  *Id.*

19

TTEC respectfully requests that the Court dismiss the SAC with prejudice.

Dated: February 1, 2024                          Respectfully submitted,

                                                 By: /s/ *Deborah S. Davidson*

Darren E. Nadel                                  Deborah S. Davidson
LITTLER MENDELSON, P.C.                          Matthew A. Russell
1900 Sixteenth Street, Suite 800                 Samuel D. Block
Denver, CO 80202-5835                            MORGAN, LEWIS & BOCKIUS LLP
DNadel@littler.com                               110 N. Wacker Drive
Tel: 303.362.2861                                Chicago, Illinois 60606
Fax: 303.362.8230                                Tel.: 312.324.1000
                                                 Fax: 312.324.1001
                                                 deborah.davidson@morganlewis.com
*Counsel for Defendants*                          matthew.russell@morganlewis.com
                                                 samuel.block@morganlewis.com

20

**CERTIFICATE OF CONFERENCE**

I certify that on January 2, 2024, the Parties in the above-captioned matter agreed upon a

briefing schedule regarding this Motion to Dismiss.  I further certify that on January 23, 2024,

TTEC conferred with Plaintiffs' counsel regarding the sufficiency of their allegations.

/s/ *Deborah S. Davidson*
Deborah S. Davidson
Morgan Lewis Bockius LLP
110 North Wacker Drive
Chicago, IL 60606-1511
deborah.davidson@morganlewis.com
Tel.: 312.324.1000
Fax: 312.324.1001

## CERTIFICATE OF SERVICE

I certify that on February 1, 2024, a true and correct copy of the foregoing was filed electronically through the Court's CM/ECF system and automatically copies to all counsel of record.

/s/ *Deborah S. Davidson*
Deborah S. Davidson
Morgan Lewis Bockius LLP
110 North Wacker Drive
Chicago, IL 60606-1511
deborah.davidson@morganlewis.com
Tel.: 312.324.1000
Fax: 312.324.1001