IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Case No. 22-CV-02188-CNS-STV

ELIJAH CARIMBOCAS,
LINDA DLHOPOLSKY, and
MORGAN GRANT, on behalf of themselves and others similarly situated,

    Plaintiffs,

v.

TTEC SERVICES CORPORATION,
TTEC SERVICES CORPORATION EMPLOYEE BENEFITS COMMITTEE,
EDWARD BALDWIN,
K. TODD BAXTER,
PAUL MILLER,
REGINA PAOLILLO,
EMILY PASTORIUS, and
JOHN AND JANE DOES 1-20,

    Defendants.

---

## ORDER

Defendants (collectively TTEC) move to dismiss Plaintiffs' second amended class action complaint. ECF No. 72. The Court previously dismissed Plaintiffs' first amended complaint for Plaintiffs' failure to state a claim, but it did so without prejudice to amend. ECF No. 60. Having reviewing Plaintiffs' second amended complaint—and viewing Plaintiffs' alleged facts in the light most favorable to Plaintiffs and drawing all reasonable inferences from the facts in their favor—the Court finds that Plaintiffs have satisfied their pleading burden. The Court, therefore, denies Defendants' motion to dismiss.

## I. BACKGROUND

The pertinent facts, drawn from Plaintiffs' second amended Complaint, ECF No. 65, are set forth in summary here and elaborated upon as necessary in the analysis.

TTEC is a Colorado-based employer with offices throughout the United Sates. *Id.*, ¶ 19. It maintains a "defined contribution" 401(k) retirement plan (the Plan or the TTEC Plan), governed by the Employee Retirement Income Security Act of 1974 (ERISA), in which employees make pre-tax contributions that are withheld from their salaries to save for retirement. *Id.*, ¶¶ 2–5, 20, 37, 39.

Plaintiffs allege that the TTEC Plan is one of the largest retirement plans in the country. *Id.*, ¶ 7. As of 2022, the Plan had over 27,000 participants and more than $285 million in assets under management, placing it in the top 0.4% of defined contribution plans in the country measured by assets and the top 0.1% measured by number of participants. *Id.*, ¶¶ 7, 66.

The Plan contracts with financial services companies, referred to as the recordkeeper and trustee, who invest the Plan's assets and provide administrative and account services to the Plan and its participants. *Id.*, ¶¶ 3, 20, 30–31. From 2012 to 2019, Merrill Lynch was the Plan's recordkeeper and trustee, and from 2020 onwards, following a request for proposal for recordkeeping services, TTEC contracted with T. Rowe Price to provide that role.[1] *Id.*, ¶¶ 30–31. The Plan's agreement with recordkeepers authorizes the recordkeepers to collect "recordkeeping" fees from each plan participant to account for the cost of services provided by the recordkeeper. *Id.*, ¶¶ 44–45. These services may include various ministerial tasks, such as "processing and tracking participant

---

[1] Plaintiffs refer to Merrill Lynch and T. Rowe Price as the Plan's "recordkeeper and trustee" initially but later solely as the "recordkeeper." The Court will do the same.

contributions." *Id.*, ¶ 45. Plan recordkeepers also typically offer a wide array of other services, such as call centers and participant websites. *Id.*

The TTEC Plan fees assessed each year are shown below:

| Year(s) | Recordkeeper | Annual Fee (per participant) |
|---|---|---|
| 2016, 2107 | Merrill Lynch | $59[2] |
| 2018, 2019 | Merrill Lynch | $54 |
| 2020, 2021 | T. Rowe Price | $45 |
| 2022 | T. Rowe Price | $43 |

*Id.*, ¶¶ 59, 62, 67. Plaintiffs contend that TTEC breached its fiduciary duties owed to Plan participants by (1) failing to prudently monitor the Plan's recordkeeping fees; (2) failing to regularly benchmark the Plan's recordkeeping fees; (3) failing to prudently negotiate the Plan's recordkeeping fees; and (4) paying higher-than-average recordkeeping fees, causing Plan participants to incur millions of dollars in losses. *Id.*, ¶ 8.

Plaintiffs initially brought claims under two general categories, alleging that (1) TTEC breached its fiduciary duty to plan participants by allowing the Plan's recordkeeper to charge participants excessive annual fees for administrative and recordkeeping services; and (2) TTEC breached its fiduciary duty to plan participants by selecting investment funds that carried excessive management fees in the form of "expense ratios." Following the Court's order granting Defendants' motion to dismiss, Plaintiffs dropped the second category of claims, electing to proceed only with the first. *See* ECF No. 61-2 (redlined second amended complaint). The two causes of action, both under ERISA,

---

[2] All annual fees charged by Merrill Lynch included a base rate that varied over the years, plus a fixed $8 "account management fee" that remained in effect throughout. ECF No. 65, ¶¶ 59, 62–63. The figures in the table for Merrill Lynch include the account management fee. TTEC does not concede that the account management fee is part of the recordkeeping fee, but it acknowledges that the Court must accept it as true for Rule 12(b)(6) purposes. ECF No. 72 at 3 n.1. T. Rowe Price did not charge a separately identified account management fee. ECF No. 65, ¶ 63 ("In 2020, T. Rowe Price became the Plan's recordkeeper. With that change, Plan participants finally stopped paying the $8 account management, as T. Rowe Price provided account management services without charging the separate $8 account management fee that Merrill Lynch charged.").

3

however, remain largely the same. Plaintiffs allege in Count I that TTEC breached its fiduciary duty to Plan participants by failing to monitor and negotiate appropriate annual fees charged by recordkeepers and by causing Plan participants to incur excessive investment fees. ECF No. 65, ¶¶ 86–92. And in Count II—a derivative cause of action—Plaintiffs allege that TTEC breached its fiduciary duties to Plan participants by failing "to monitor the performance of the Employee Benefits Committee and the Committee Defendants." *Id.*, ¶¶ 93–101.

## II.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted." The dispositive inquiry is whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court must take all the factual allegations in the complaint as true and "view these allegations in the light most favorable" to the nonmoving party. *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010). On a Rule 12(b)(6) motion, a court's function is "not to weigh potential evidence that the parties might present at trial, but to assess whether the [] complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citation and internal quotation marks omitted). The pleading standard is a liberal one, however, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and

unlikely." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (citation and internal quotation marks omitted).

### III.   ANALYSIS

Employee benefit plans, including 401(k) plans sponsored by employers, are subject to ERISA's requirement that plan administrators "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries," and "with the care, skill, prudence, and diligence . . . that a prudent [person] acting in a like capacity would use." 29 U.S.C. § 1104(a)(1). Plan administrators have "a continuing duty to monitor investments and remove imprudent ones." *Tibble v. Edison Intern.*, 575 U.S. 523, 530 (2015). The Tenth Circuit has recognized that the fiduciary duties imposed on plan administrators include a duty to avoid "fees associated with the defined-contribution plan [that] are too high compared to available, cheaper options." *Matney v. Barrick Gold of North America*, 80 F.4th 1136, 1148 (10th Cir. 2023).

In *Matney*, the Tenth Circuit, under similar facts, considered a plaintiff's pleading burden where the plaintiff alleged that his plan charged "higher fees than comparatively cheaper options in the marketplace." 80 F.4th at 1146. The Tenth Circuit adopted the "meaningful benchmark" test for excessive fee suits, meaning that, "to raise an inference of imprudence through price disparity, a plaintiff has the burden to allege a 'meaningful benchmark'" to which the defendant's plan can be compared. *Id.* at 1148 (quoting *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018)).

For a comparison to be "meaningful" in the administrative-cost context, the plaintiff must allege facts showing "that the recordkeeping services rendered by the chosen comparators are similar to the services offered by the plaintiff's plan." *Id.* at 1148–49

5

(citing *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022) for the proposition that the plaintiff "failed to allege that the fees were excessive relative to the services rendered" (citation and internal quotation marks omitted), and *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 279 (8th Cir. 2022) for the proposition that a court "cannot infer imprudence unless similarly sized plans spend less on the same services").

Turning to Plaintiffs' administrative- and recordkeeping-fee claim, Plaintiffs compare the TTEC Plan—a defined-contribution plan that as of 2021, involved over 27,000 participants and $285 million in assets, ECF No. 65, ¶¶ 65–66[3]—to the Bricklayers and Trowel Trades' International Retirement Savings Plan (the Bricklayers Plan), which at the end of 2021 had approximately 21,600 participants and $239 million in assets. *Id.*, ¶ 59.[4] According to Plaintiffs, the Bricklayers Plan charged participants an annual administrative fee of $25.56 in 2021, whereas T. Rowe Price charged participants in TTEC's Plan a $45 fee that same year. *Id.*

In the Court's order dismissing Plaintiffs' first amended complaint, it held that, under *Matney*, Plaintiffs' allegations concerning the Bricklayers Plan were insufficient to identify it as a meaningful benchmark to the TTEC Plan. ECF No. 60 at 8–11. As alleged in the first amended complaint, the Court explained that "Merrill Lynch and T. Rowe Price provided more services to the TTEC Plan than the Bricklayers Plan's trustee provided." *Id.* at 9. Specifically, Plaintiffs identified seven services that Merrill Lynch and T. Rowe Price provided to Plan participants. *Id.* at 8. Those services included (1) processing

---

[3] Plaintiffs offer some historical data for the TTEC Plan. In 2016, the Plan had 17,448 participants and approximately $122 million in assets. ECF No. 65, ¶ 59. By 2019, the Plan had over $176 million in assets. *Id.*, ¶ 60. And by the end of 2021, the Plan had over $285 million in assets. *Id.*, ¶ 65. But as the Court noted in its previous order, Plaintiffs do not identify comparable trends for the Bricklayers Plan, offering only a single snapshot of that plan as it existed in 2021. *See id.*, ¶ 59.
[4] The cited paragraph is numbered as 59, but it appears between paragraphs 72 and 73 in the second amended complaint. *See* ECF No. 65 at 18.

6

participant enrollment in the Plan and providing participants with Plan materials; (2) processing and tracking participant contributions and allocating those contributions among Plan investment options; (3) processing and tracking balances and transactions on participants' accounts, including loans, distributions, and withdrawals; (4) generating participant account statements showing contributions, investment allocations, and vested account balances; (5) providing systems for participants to access Plan information, including a web portal and telephone access to a service representative; (6) preparing the Plan's annual Form 5500 statement to the Department of Labor; and (7) furnishing the Plan's fiduciaries with participant and investment information to assist with Plan administration. *Id.* at 8–9. Plaintiffs did not amend these seven services in their second amended complaint. *See* ECF No. 61-2, ¶ 45.

The Court then compared those seven services to the four services Plaintiffs alleged that the Bricklayers Plan's recordkeeper provided. *Id.* at 9. The Court went further and found that Plaintiffs did not allege that the additional services Merrill Lynch and T. Rowe Price provided to the TTEC Plan are *de minimis* or inconsequential in driving the fixing of annual fees charged to participants. *Id.* at 10. The Court thus concluded that Plaintiffs' plan comparisons failed to comply with the pleading requirements established in *Matney*. *Id.* at 10–11.

Plaintiffs then moved to amend. ECF No. 60. They explained that they did not act in bad faith in filing their first amended complaint because the Tenth Circuit issued *Matney* after they filed their first amended complaint. *Id.* at 1. The Court granted their motion to amend and docketed the second amended complaint attached to their motion. ECF No. 61.

In reviewing Plaintiffs' second amended complaint, it would be an understatement to say that the new allegations leave something to be desired. The Court, however, cannot say that they fail to state a claim. Plaintiffs allege that "other plans with the same amount of assets under management and/or the same number of plan participants paid less for recordkeeping fees *for the same tasks* that Merrill Lynch and T. Rowe Price performed for the Plan." ECF No. 65, ¶ 72. Plaintiffs then address the Bricklayers Plan in a single paragraph:

> For example, at the end of 2021, the Bricklayers [] Plan had 21,600 participants and $239,550,899 in assets, yet its plan participants paid a recordkeeping fee of $25.56 per participant, well below the $45 per participant fee charged to Plan participants here for comparable services. **The Bricklayers plan is a meaningful benchmark to the Plan because, at all relevant times, both plans provided *the exact same* seven recordkeeping services listed in Paragraph 45, above. Again, these recordkeeping services are required by ERISA and/or specified in the plan document**.

ECF No. 65, ¶ 59 (italics in original but bold emphasis added to reflect the new allegations contained in the second amended complaint). Plaintiffs also include the same footnote that appeared in their first amended complaint, stating that "a complete list of the services provided by the recordkeeper for the [Bricklayers Plan] is not publicly available." *Id.*, ¶ 59 n.15. Plaintiffs appear to derive the list of services provided from the Bricklayers Plan's Form 5500 submitted to the Department of Labor. *Id.*; *see also id.* at ¶ 59 n.14 (including a link to the 2021 Form 5500 for the Bricklayers Plan). Plaintiffs allege that the Bricklayers Plan's recordkeeper could not have submitted the recordkeeping data in the Form 5500 without performing each of these services. *Id.*, ¶ 59 n.15.

8

Plaintiffs' second amended complaint does what *Matney* requires: they cite a publicly available document (Form 5500) purporting to show that the Bricklayers Plan, whose assets under management and participant base nearly mirrors the Plan's figures, paid fees of $25 per participant for the "exact same seven recordkeeping services" they allege the TTEC Plan provides. Contrast this with Plaintiff Matney's complaint, where the Tenth Circuit explained that he failed to "offer factual allegations about the services provided either by Barrick Gold's plan or the plans assessed in the 401k Averages Book." *Matney*, 80 F.4th at 1157–58. *Matney* also said that a comparison for recordkeeping fees "will be meaningful if the complaint alleges that the recordkeeping services rendered by the chosen comparators are similar to the services offered by the plaintiff's plan." *Id.* at 1149; *see also Matousek*, 51 F.4th at 279 ("[W]e cannot infer imprudence unless similarly sized plans spend less on the same services."). In light of the new allegations, and viewing those allegations "in the light most favorable to Plaintiffs" and with "all reasonable inferences" drawn in their favor," *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021), the Court can no longer say that Plaintiffs fail to provide an "apples-to-apples comparison." *Matney*, 80 F.4th at 1149. The Court, therefore, finds that Plaintiffs have plausibly alleged that the Bricklayers Plan offered a sufficiently similar set of services at a lower price point to make it a meaningful benchmark against which to compare the TTEC Plan.

With that said, Plaintiffs have now had three opportunities to properly plead their case, and they only identified one comparable plan.[5] Because Plaintiffs bring a class

---

[5] Plaintiffs also argue that their allegations that the Plan paid unreasonable and excessive recordkeeping fees is bolstered further by data from case law and the 401k Averages Book. The Court has already explained why the various case citations—which Plaintiffs did not amend in any way—do not present sufficiently meaningful benchmarks. ECF No. 60 at 7–8. The Court did the same for the allegations

action on behalf of thousands of Plan participants, Defendants raise a real concern over the prospect of a costly and timely discovery process when Plaintiffs' comparison hinges on a single plan in a single year. ECF No. 74 at 7. The Second Circuit has raised this same concern: "the prospect of discovery in a suit claiming breach of fiduciary duty is ominous, potentially exposing the ERISA fiduciary to probing and costly inquiries and document requests about its methods and knowledge at the relevant times." *Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 719 (2d Cir. 2013). The Court encourages the parties to work on a tailored discovery plan with Magistrate Judge Varholak that addresses the concern that Defendants—and the Court—have.[6]

* * *

---

concerning the 401(k) Averages Book. *Id.* at 7. The Court said that the 401(k) Averages Book does not provide the "like-for-like comparison" necessary to plausibly allege an excessive fee claim. *Matney*, 80 F.4th at 1157 (*citing Matousek*, 51 F.4th at 280); *see also Matousek*, 51 F.4th at 279–80 ("Rather than point to the fees paid by other specific, comparably sized plans, the plaintiffs rely on industry-wide averages. But the averages are not all-inclusive: they measure the cost of the typical 'suite of administrative services,' not anything more. And using this information creates a mismatch between Merrill Lynch's total compensation, which includes everything it does for MidAmerican's plan, and the industry-wide averages that reflect only basic recordkeeping services."). In response, Plaintiffs add just two sentences to their second amended complaint: "Importantly, each of the plans listed in the 401k Averages Book provide the exact same seven recordkeeping services listed in Paragraph 45, above, that Merrill Lynch and T. Rowe Price provided for the Plan. Indeed, many of these recordkeeping services are required by ERISA and evinced by the required information reported by each plan to the Department of Labor on each plan's Form 5500s." ECF No. 65, ¶ 50. Unlike with the Bricklayers Plan, the Court will not accept this conclusory allegation as true. Plaintiffs do not (and cannot) name even one of the recordkeepers surveyed in the book. *See* ECF No. 72-1 (an excerpt from the 401(k) Averages Book's frequently asked questions states: "Who are the providers included in the database? We do not release the names of the providers or products in the 401k Averages Book database.").

[6] The Court acknowledges that Defendants argue that the Bricklayers Plan is "so structurally distinct" from the TTEC plan as to render the two incomparable, and that a close examination of the Bricklayers Plan would reveal that its annual recordkeeping fees for comparable plan participants are actually in excess of the fees charged to the TTEC Plan participants. ECF No. 72 at 16–17. This analysis, however, would require the Court to consider several exhibits and other sources that a court typically would consider only on summary judgment. In the Court's view, a tailored or phased discovery plan would be a more appropriate course to determine whether the Bricklayers Plan, as Plaintiffs allege, in fact "provided *the exact same* seven recordkeeping services" as TTEC's Plan for a much lower price.

Because Plaintiffs' second amended complaint adequately identifies a meaningful benchmark comparator offering the same services as the TTEC Plan's recordkeeper at a much lower price, Plaintiffs have stated a claim for breach of fiduciary duty under ERISA with regard to the administrative and recordkeeping expenses charged to Plan participants. The Court thus declines to dismiss Plaintiffs' breach of fiduciary duty of prudence claim or their derivative failure to monitor claim.

### IV.   CONCLUSION

For the reasons above, TTEC's Motion to Dismiss Plaintiffs' Second Amended Class Action Complaint, ECF No. 72, is DENIED.

DATED this 25th day of September 2024.

BY THE COURT:

_____
Charlotte N. Sweeney
United States District Judge